## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

EBLAL ZAKZOK,
SUMAYA HAMADMAD,
FAHED MUQBIL,
JOHN DOE #1, and
JANE DOES #2-3

        *Plaintiffs*,

      v.

DONALD TRUMP, in his official capacity
as President of the United States,
1600 Pennsylvania Avenue NW
Washington, D.C. 20035

U.S. DEPARTMENT OF HOMELAND
SECURITY,
Serve on: Elaine Duke
Acting Secretary of Homeland Security
Washington, D.C. 20528;

U.S. DEPARTMENT OF STATE,
Serve on: Rex W. Tillerson,
Secretary of State
2201 C Street NW
Washington, D.C. 20520;

ELAINE DUKE
In her official capacity as Acting Secretary
of Homeland Security
Washington, D.C. 20528;

REX W. TILLERSON
In his official capacity as Secretary of State
2201 C Street NW
Washington, D.C. 20520

        *Defendants*.

Civil Action No.:

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

## INTRODUCTION

1. This case is a challenge to President Donald Trump's third attempt at banning Muslims from the United States. On September 24, 2017, President Trump issued a proclamation titled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats." Proclamation No. 9645, 82 Fed Reg. 45,161 (Sept. 24, 2017) ("Proclamation"). The Proclamation, *inter alia*, indefinitely banned virtually all travel to the United States from six Muslim-majority countries. Plaintiffs are citizens or permanent residents of the United States who will not be able to reunite with their family members or will otherwise be injured as a direct result of the Proclamation.

2. The President previously attempted to halt the entry of Muslims to the United States on two occasions. One week after taking office, fulfilling a campaign pledge to effectuate a "total and complete shutdown of Muslims entering the United States,"[1] President Trump issued an executive order titled "Protecting the Nation from Foreign Terrorist Entry into the United States." Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017) ("EO-1"). The order suspended travel from seven majority-Muslim countries for 90 days and banned all refugees from those countries. EO-1 contained an exception for "minority faiths," making explicit its discriminatory intent, and the order was quickly enjoined by federal courts. *See Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir.), *cert. granted,* 137 S. Ct. 2080 (2017) (per curiam).

---

[1] Jenna Johnson, *Trump Calls for 'Total and Complete Shutdown of Muslims Entering the United States,'* N.Y. Times, Dec. 7, 2015, https://www.washingtonpost.com/news/post-politics/wp/2015/12/07/donald-trump-calls-for-total-and-complete-shutdown-of-muslims-entering-the-united-states/.

3.   On March 27, 2017, the President issued what he described as a "watered down" version of EO-1,[2] also called "Protecting the Nation From Foreign Terrorist Entry Into the United States." Exec. Order No. 13780, 82 Fed. Reg. 13,209 (Mar. 6, 2017) ("EO-2").  It too was enjoined by several federal courts as unconstitutional and in violation of the Immigration and Nationality Act ("INA"), §§ 202(a)(1)(A), 207, 212(f), Pub. L. No. 89-236, 66 Stat. 187 (codified as amended at 8 U.S.C. §§ 1152(a)(1)(A), 1182(f)). *Hawaii v. Trump*, 859 F.3d 741 (9th Cir.) (per curiam), *cert. granted sub nom. Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017).   On June 26, 2017, the Supreme Court consolidated the Hawaii and Maryland cases, granted certiorari, and narrowed the preliminary injunctions entered by the lower courts. *Trump v. Int'l Refugee Assistance Project,* 137 S. Ct. 2080, 2086-87 (2017) (per curiam).

4.   Like the previous two iterations, President Trump's September 2017 attempt at instituting a Muslim ban invokes national security concerns. In defending EO-2, the government argued that a suspension on travel was necessary to protect the country from the threat of terrorist attacks from nationals of the targeted countries.  The Ninth Circuit rejected that argument, noting that there had been "no finding that present vetting standards are inadequate, and no finding that absent the improved vetting procedures there likely will be harm to our national interests." *Hawaii*, 859 F.3d at 771.

5.    The government now offers a new – and equally unsupported – rationale. According to the Proclamation, between July 9, 2017 and September 15, 2017, the Departments of State and Homeland Security carried out a "worldwide review" of visa procedures in

---

[2] Jacob Pramuk, *Trump May Have Just Dealt a Blow to His Own Executive Order,* CNBC, Mar. 15, 2017, http://www.cnbc.com/2017/03/15/trump-may-have-just-dealt-a-blow-to-his-own-executive-order.html.

order to determine which countries were "inadequate" based on an analysis of their "identity-management protocols, information-sharing practices, and risk factors." Proclamation at §1(e). This contrived process identified 47 countries as "inadequate" or "at risk" of becoming "inadequate." *Id.* In the end, however, the administration acted on the same religious animus that animated the first two unlawful orders and imposed indefinite wholesale ban on citizens of five of the same countries that were the subject of EO-1 and EO-2: Iran, Libya, Somalia, Syria, and Yemen. Another Muslim majority country, Chad, was also added to the list. Finally, North Korean nationals, as well as certain Venezuelan government officials and their families, were also banned.

6.   Throughout, President Trump's objective has remained constant: to keep Muslims out of the United States.  The visa "review" is a pretext.  Adding North Koreans and small group of Venezuelan government officials to the mix does not change this, but rather is a transparent attempt to add a fig leaf of religious neutrality to the order. The primary effect of the Proclamation is to exclude the nationals of several Muslim countries without adequate justification as to why or how this would protect the homeland.

7.  The Proclamation imposes concrete harms on American Muslim citizens and permanent residents whose family members are barred from traveling to the United States. Like its predecessors, EO-1 and EO-2, the Proclamation violates the fundamental constitutional guarantee that the government may not establish or favor one religion over another. Like the President's earlier orders, it also violates the prohibition against discrimination on the basis of race, nationality or country of origin contained in the Immigration and Nationality Act, and exceeds the President's authority under that law to identify classes of aliens who are not eligible for entry to the United States.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution, the Administrative Procedure Act ("APA") § 10(e), 5 U.S.C. §706, and the Immigration and Nationality Act ("INA") §§ 202(a)(1)(A), 207, 212(f), Pub. L. No. 89-236, 66 Stat. 187 (codified as amended at 8 U.S.C. §§ 1152(a)(1)(A), 1182(f)).

9. This Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the APA, 5 U.S.C. § 706.

10. Venue is proper in this District under 28 U.S.C. §1391(b)(2) and (e)(1). Defendants are officers or employees of the United States acting in their official capacities, and agencies of the United States. Plaintiff Jane Doe #2 resides in this District.  No real property is involved in this action.

**PARTIES**

11. Plaintiff Eblal Zakzok, PhD, is a native of Syria and a lawful permanent resident of the United States, who currently resides in Columbus, Ohio. Dr. Zakzok teaches Surveying, Remote Sensing and Geographical Information Systems at the Ohio State University. He was tortured in Aleppo by the Syrian regime and granted asylum in the United States in 2014. Dr. Zakzok's wife and three of his children were granted asylee benefits in 2016 and came to the U.S. to join him. But Dr. Zakzok's eldest daughter was forced to remain in Turkey, as she was over 21 at the time and thus not eligible for derivative asylum benefits. On August 25, 2017, Plaintiff Zakzok filed a Petition for Alien Relative, Form I-130, seeking approval for his daughter, Turkie, to immigrate to the United States.  The Petition is currently still pending with USCIS.

12. Plaintiff Sumaya Hamadmad is an American citizen of Syrian descent who currently resides in Ohio. Plaintiff Hamadmad's sister is a Syrian national, currently residing in Amman, Jordan, who is trying to visit Hamadmad and her other relatives in the United States. She also plans to participate in an academic project with American researchers and applied for a B1/B2 visa on October 3, 2017. Plaintiff Hamadmad's father-in-law is a Syrian national, living in Syria. Hamadmad's husband filed an I-130 Petition for Alien Relative on behalf of his father.  The Petition is currently still pending with USCIS.

13. Plaintiff Fahed Muqbil is an American citizen of Yemeni descent who currently resides in Mississippi. In 2012, Muqbil married his wife, a Yemeni national. They have two daughters together, one of whom has a serious birth defect and is currently receiving medical treatment in the United States. Plaintiff Muqbil seeks to bring his wife, who now resides in Egypt, to the United States as an immigrant on the basis of their marriage. In June 2017, Muqbil submitted an I-130 Petition for Alien Relative on behalf of his wife, which was subsequently approved on August 17, 2017.  Plaintiff Muqbil and his wife have an appointment for a visa interview in Egypt scheduled for October 10, 2017.

14. John Doe #1 is a United States citizen residing in New Jersey. In 2017, he married a Syrian national in the United States. John Doe #1 seeks to bring his wife, who now resides in Portugal, back to the United States as an immigrant on the basis of their marriage.

15. Jane Doe #2 is an American citizen of Syrian descent who currently resides in Maryland with her mother, her husband, and her child. Earlier this year, Jane Doe #2 submitted an I-130 Petition on behalf of her father, a Syrian national living in a Gulf nation, who seeks

to immigrate to the United States and be reunited with his family. USCIS approved the petition, but her father has not yet been interviewed for his visa application.

16. Jane Doe #3 is an American citizen residing in Minnesota. She is engaged to a Somali foreign national residing in Malaysia, who seeks to immigrate to the United States and marry Jane Doe #3. She has submitted an I-129F petition on behalf of her fiancé, which USCIS has approved.  However, the fiancé's visa application is still pending.

17. Defendant Donald J. Trump is the President of the United States. He issued the original January 27, 2017, Executive Order (EO-1), the second March 6, 2017, Executive Order (EO-2), and most recently, the September 24, 2017, Proclamation that is the subject of this Complaint.

18. Defendant U.S. Department of Homeland Security ("DHS") is a federal cabinet agency responsible for implementing and enforcing the INA and the Proclamation that is the subject of this Complaint. DHS is a Department of the Executive Branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 522(f). The U.S. Citizenship and Immigration Services ("USCIS") is a component of DHS that is responsible for adjudicating requests for immigration benefits for individuals located within the United States.

19. Defendant U.S. Department of State is a federal cabinet agency responsible for implementing the Proclamation that is the subject of this Complaint. It is a department of the Executive Branch of the United States Government, and it is an agency within the meaning of 5 U.S.C. § 522(f).

20. Defendant Elaine Duke is the Acting Secretary of Homeland Security. Acting Secretary Duke has responsibility for overseeing enforcement and implementation of the Proclamation by all DHS staff. She is sued in her official capacity.

21. Defendant Rex Tillerson is the Secretary of State and has responsibility for overseeing enforcement and implementation of the Proclamation by all State Department staff. He is sued in his official capacity.

## STATEMENT OF FACTS

### President Trump's Statements on Muslims and Islam

22. Defendant Trump has made frequent, explicitly bigoted statements about Islam and Muslims in print, on television, via official statements, and on Twitter. EO-1, EO-2, and the Proclamation are the manifestations of that religious animus.

23. On or about March 10, 2016, in an interview aired on CNN, Defendant Trump declared "Islam hates us."[3]

24. On December 13, 2015, during a Fox News interview, Defendant Trump was asked if his campaign promise to implement a Muslim Ban would apply to a Canadian businessman who is Muslim.  His response equated Islam to a disease and said that its followers were sick, disease-ridden people.  Specifically, Defendant Trump stated: "There's a sickness. They're [Muslims are] sick people.  There's a sickness going.  There's a group of people that is very sick."[4]

---

[3] Theodore Schleifer, *Donald Trump: 'I think Islam hates us,'* CNN, Mar. 10, 2016, http://www.cnn.com/2016/03/09/politics/donald-trump-islam-hates-us/.
[4] Dan Friedman, *Trump cites 'sickness' in defense of Muslim immigration ban proposal*, Washington Examiner, Dec. 13, 2015, http://www.washingtonexaminer.com/trump-cites-sickness-in-defense-of-muslim-immigration-ban-proposal/article/2578269.

25. Defendant Trump's campaign statements regarding Islam and Muslims reveal that the intent of the Proclamation, like EO-1 and EO-2 before it, is to disfavor Islam and stigmatize Muslims.

26. After winning the Republican nomination, Defendant Trump began using more neutral language to describe his Muslim Ban pledge.

27. On or about July 24, 2016, however, Defendant Trump conceded that the neutral language was simply a veneer intended to subdue the public controversy generated by his discriminatory plan.  In an interview on NBC, Defendant Trump explained: "People were so upset when I used the word Muslim.  Oh, you can't use the word Muslim…And I'm OK with that, because I'm talking territory instead of Muslim."[5]

## EO-1

28. On January 27, 2017, Defendant Trump issued EO-1. Section 3(c) suspended entry of immigrant and nonimmigrant nationals of seven Muslim-majority countries: Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen.

29. Although EO-1 did not use the words Islam or Muslim, the pretext was apparent from the beginning. A close Trump advisor, Rudolph Giuliani, boasted on national television that he had been asked to "show [Donald Trump] the right way to do [the Muslim Ban] legally." Giuliani said he had formed a commission to find a way to achieve the Muslim Ban's scope without mentioning Islam or Muslims.[6]

---

[5] Carrie Dann, *Donald Trump: I'm Running Against Hillary Clinton, Not 'Rest of the World,'* NBC News, July 24, 2016, https://www.nbcnews.com/storyline/2016-conventions/trump-i-m-running-against-hillary-not-rest-world-n615581.
[6] Amy Wang, *Trump asked for a 'Muslim ban,' Giuliani says – and ordered a commission to do it 'legally,'* Wash. Post, Jan. 29, 2017, http://wapo.st/2khcw0t?tid=ss_tw&utm_term=.ab2db76b30de.

30. Indeed, EO-1 contained explicit preferences for "religious minorities" in the seven Muslim-majority countries targeted by the ban. Sections 5(b) and 5(e) established special benefits only available to persons who were not Muslim.  Section 5(b) authorized the Secretary of State "to prioritize refugee claims made by individuals on the basis of religious-based persecution … provided that the religion of the individual is a minority religion in the individual's country of nationality."  Since the countries that were the subject of the ban were overwhelmingly Muslim, these religious minorities were by definition non-Muslim people. Section 5(e) contained a similar explicit preference for persons who were not Muslim from the seven banned countries.

31. EO-1 also contained a reference to "honor killings," a term that is commonly used to portray domestic violence in the Muslim community as sanctioned by Islam. It suggested that the threat of admitting persons who engaged in "honor killings" was what, in part, justified the categorical visa ban on seven Muslim-majority countries.

32. Defendant Trump emphasized EO-1's religious preference.  He explained during an interview with the Christian Broadcasting Network that his order was "going to help [persecuted Christians]" as opposed to Muslims.  His answer made clear that the intent of EO-1 was to treat foreign nationals in the seven identified countries differently based on their faith.[7]

33. EO-1 was immediately challenged in several courts and its operative provisions were enjoined, including by a nationwide injunction issued on February 3, 2017.  *See Washington v. Trump*, No. C17-0141-JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017)

---

[7] Carol Morello, *Trump Signs Order Temporarily Halting Admission of Refugees, Promises Priority for Christians,* Wash. Post, Jan. 27, 2017, http://wapo.st/2kbZl05?tid=ss_tw&utm_term=.816cd900dc2d.

(enjoining sections 3(c), 5(a)-(c), and 5(e) of EO-1); *Darweesh v. Trump*, No. 17 CV 480, 2017 WL 388504 (E.D.N.Y. Jan. 28, 2017) (prohibiting the government from removing individuals pursuant to EO-1); *Aziz v. Trump*, No. 1:17 CV 116, 2017 WL 580855 (E.D. Va. Feb. 13, 2017) (granting preliminary injunction of portions of EO-1 on Establishment Clause grounds).

34. On February 9, 2017, the Ninth Circuit Court of Appeals issued a unanimous decision upholding a temporary restraining order issued by the United States District Court for the Western District of Washington enjoining and restraining Sections 3(c) and 5(a)-(c) of the First Muslim Ban. *See Washington*, 847 F.3d 1151.

35. Defendant Trump revoked EO-1 via a subsequent order, Exec. Order No. 13780, "Protecting the Nation from Foreign Terrorist Entry Into the United States" (EO-2).

## EO-2

36. Defendant Trump signed EO-2 on March 6, 2017, which was a clear continuation of Defendant Trump's attempt to discriminate against Muslims and broadcast a message of disfavor against Islam.

37. Aside from a new "Policy and Purpose" section, EO-2 is largely the same as EO-1. Indeed, EO-2 contains entire sections of EO-1's text, including EO-1's Section 5(g), Section 6, Section 8, and Section 10.

38. EO-2 established the same mechanism as EO-1 to extend the 90-day ban applicable to foreign nationals from six of the seven banned countries. EO-2 §2. And it adopted the same mechanism to review information from foreign countries to determine whether additional countries should be added. *Id.*

39. EO-2 excluded Iraq from its scope and exempted lawful permanent residents and current visa holders, but it kept the 120-day refugee ban and reduced the refugee cap to 50,000. EO-2 also maintained EO-1's reference to "honor killings" associated with Muslims.

40. A senior advisor to Defendant Trump, Stephen Miller, explained that the goal of EO-2's revisions was "to be responsive to the judicial ruling" and that the changes in EO-2 were to be "mostly minor, technical differences. Fundamentally, you are still going to have the same, basic policy outcome for the country."[8]

41. The national security claims underlying EO-2 were obviously pretextual. The Department of Homeland Security had conducted an assessment concluding that national origin was an "unlikely indicator" of terrorist threats to the US, and that the countries affected by EO-1 and EO-2 were not the top countries of origin for immigrants who actually committed acts of terrorism inside the United States.[9]

42. On March 15, 2017, the U.S. District Court for the District of Hawaii issued a nationwide injunction enjoining Defendants from enforcing or implementing sections 2 and 6 of EO-2. *Hawaii v. Trump*, 241 F.Supp.3d 1119 (D. Haw. 2017). On June 12, 2017, the Ninth Circuit largely upheld the injunction. *See Hawaii*, 859 F.3d at 756.

43. On March 16, the U.S. District Court for the District of Maryland also issued a nationwide injunction against parts of EO-2, *Int'l Refugee Assistance Project v. Trump*, 241 F.Supp.3d 539 (D. Md. 2017), which was upheld in relevant part by the Fourth Circuit on May 25, 2017. *Int'l Refugee Assistance Project*, 857 F.3d at 544.

---

[8] *Miller: New Order Will Be Responsive to the Judicial Ruling,* Fox News (Feb. 21, 2017), http://video.foxnews.com/v/5331823544001/?#sp=show-clips.

[9] *Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States,* Dept. of Homeland Sec., https://assets.documentcloud.org/documents/3474730/DHS-intelligence-document-on-President-Donald.pdf (draft report obtained and released by Associated Press on Feb. 24, 2017).

44. The Defendants in *Hawaii* and *Int'l Refugee Assistance Project* petitioned the Supreme Court for a writ of *certiorari* and applied for a stay of the injunctions pending appeal.  On June 26, 2017, the Supreme Court granted *certiorari*, consolidated the two cases, and partially stayed the preliminary injunctions, allowing the Second Muslim Ban to become effective, except as to foreign nationals with a "bona fide relationship with a person or entity in the United States." *See Trump*, 137 S. Ct. at 2088.

45. The Court stayed the *Hawaii* injunction with respect to "foreign nationals abroad who have no connection to the United States," but reaffirmed that sections 2(c), 6(a), and 6(b) of EO-2 "may not be enforced against foreign nationals who have a credible claim of a bona fide relationship with a person or entity in the United States." *Id.* at 2088.  The Court's order specifically protected foreign nationals with a "close familial relationship" with a person in the United States.  *Id.*

46. Following the Court's ruling, the Department of Homeland Security adopted a narrow interpretation of "close familial relationship" designed to exclude as many Muslims as possible from the United States.  DHS's definition of "close familial relationship" excluded grandparents and aunts but allowed mothers-in-law and siblings. This definition was challenged and, on July 13, 2017, the Hawaii district court modified its preliminary injunction to prohibit Defendants from applying the Second Muslim Ban to grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins of persons in the United States.  The court concluded that such individuals have sufficiently "close family relationship" to fall within the ambit of the preliminary injunction, as modified by the Supreme Court.  *Hawaii v. Trump*, No. CV 17-00050 DKW-KSC, 2017 WL 2989048 (D. Haw. July 13, 2017).

47. Defendants provided no rationale for their narrow definition of "close familial relationship" and no security-based rationale exists for allowing siblings but not grandparents of U.S. persons to travel to the United States. The only explanation for such an irrational definition is a desire to keep as many Muslims as possible out of the United States.

48. On July 19, 2017, the Supreme Court denied the government's motion seeking clarification of the Court's June 26, 2017 order, thereby leaving the Hawaii court's July 13, 2017 modified injunction in place. *See Trump v. Hawaii*, No. 16-1540, 2017 WL 3045234, 86 U.S.L.W. 3039 (U.S. July 19, 2017).

49. Under the terms of EO-2 and a subsequent Presidential Memorandum, the entry ban on national of the six countries without such bona fide relationship remained in effect until September 24, 2017,[10] the day the President signed the Proclamation at issue in this case.

50. The Supreme Court had scheduled oral argument in the *Int'l Refugee Assistance Project* and *Hawaii* cases for October 10, 2017. But following the Proclamation, the Court removed the oral argument from its calendar and ordered additional briefing from the parties on whether the Proclamation renders the cases moot. *Trump v. Int'l Refugee Assistance Project,* No. 16-1436, 2017 WL 2405595 (U.S. Sept. 25, 2017).

**The Proclamation**

51. On September 24, 2017, the day EO-2 was set to expire, Defendant Trump signed the latest iteration of the Muslim ban, the Proclamation at issue in this case. The Proclamation, *inter alia*, permanently bans people from most of the Muslim countries

---

[10] *See* Memorandum of June 14, 2017 on Effective Date in Executive Order 13780, 82 Fed. Reg. 27,965 (June 19, 2017).

targeted in EO-1 and EO-2: Iran, Libya, Syria, Yemen, and Somalia. It also includes a

ban on people from Chad, another Muslim-majority country.

52. The Proclamation also bans travel from North Korea (from which a negligible number of

people come to the United States) as well as some government officials from Venezuela.

The impact of the Proclamation, however, is overwhelmingly on Muslims.

53. The Proclamation is an outgrowth of EO-2, which directed the Departments of State and

Homeland Security to conduct a "worldwide review" to determine whether additional

information would be required from some countries to properly adjudicate visa

applications.[11] This review found 47 countries to be "inadequate" or "at risk" of

becoming "inadequate." Proclamation at § 1(e).   But the end product was just a

permanent iteration of EO-1 and EO-2, establishing indefinite wholesale bans on five of

the same Muslim countries, based on the same religious animus.

54. On September 27, 2017, Defendant Trump was asked why Sudan was removed from the

ban list. Defendant Trump provided no explanation for this action.

55. The addition of North Korea and a small number of Venezuelan government officials to

the travel blacklist is a transparent attempt to disguise the Proclamation's anti-Muslim

intent. Only a tiny number of travelers would be affected (just 109 visas were issued to

North Korean nationals in 2016, for example),[12] and neither country has a history of

sponsoring terrorism in the United States.

---

[11] This review was required by EO-2 § 2. It was temporarily enjoined by a federal court as part of the travel ban litigation, but allowed to go forward in June 2017. *Hawaii v. Trump*, No. 17-00050-DKW-KSC at 23 (D. Haw. Mar. 23, 2017); *Hawaii v. Trump*, 859 F.3d at 741.

[12] Department of State – Bureau of Consular Affairs, *Table XVIII: Nonimmigrant Visas Issued by Nationality (Including Border Crossing Cards) Fiscal Year 2007-2016*, https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY16%20NIV%20Detail%20Table.pdf  (last accessed Oct. 4, 2017)

56. Overall, the Proclamation bars approximately 138 million Muslim nationals from six Muslim-majority nations, which is more than 85% of the people affected by the Proclamation.[13]

57. The practical effects of the Proclamation also bear a striking resemblance to EO-2. Using 2016 data as a baseline, the current policy would ban 76% of nonimmigrant visa applicants and 91% of immigrant visa applicants affected by the previous order.[14] The overlap is substantial despite the inclusion of Chad and North Korea, which together only had 1,049 total visas issued in 2016 of the kind affected by the Proclamation – tourist, business, and immigrant visas for Chad (940), and all visas for North Korea (109). Likewise, the addition of Venezuela does not meaningfully change the calculus because the restrictions apply only to government officials and their families, not to ordinary visa applicants.

58. In effect, the Proclamation makes permanent many of the temporary restrictions imposed by EO-1 and EO-2. For example, whereas EO-2 temporarily banned Iranian nationals

---

(100 nonimmigrant visas issued); Department of State – Bureau of Consular Affairs, *Table XIV: Immigrant Visas Issued at Foreign Service Posts (by Foreign State Chargeability) (All Categories) Fiscal Years 2007-2016*, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2016AnnualReport/FY16 AnnualReport-TableXIV.pdf (last accessed Oct. 4, 2017) (9 immigrant visas issued).

[13] *See* Pew Research Ctr., *The Global Religious Landscape* 45–50 (2012).

[14] Harsha Panduranga, Faiza Patel, & Michael Price, *Extreme Vetting & the Muslim Ban* 14 (2017). For State Department figures on total nonimmigrant U.S. visa types issued to foreign states, *see* Department of State – Bureau of Consular Affairs, *FY 2016 Nonimmigrant Visas Issued*, https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY16%20NIV%20Detail%20Table.pdf (last accessed September 26, 2017). For State Department figures on U.S. immigrant visas issued to foreign states, *see* Department of State – Bureau of Consular Affairs, *Table XIV: Immigrant Visas Issued at Foreign Service Posts (by Foreign State Chargeability) (All Categories) Fiscal Years 2007-2016*, *supra*. Data from the tables above were used in combination with the visa issuance types exempted from Executive Order 13780 and Proclamation 9645 to calculate the total number of individuals in the new policy banned from entry in Panduranga, Patel, & Price, *supra*, at 14.

from obtaining any visas, the Proclamation permanently bans Iranian nationals from obtaining most kinds of visas.  For the few visas still available to Iranian nationals, those visas are now subjected to a different process.

59. Like EO-2, the Proclamation makes it impossible for nationals from Syria, Somalia, Libya, Yemen, and Iran to obtain immigrant visas.  Like EO-2, the Proclamation makes it impossible for Syrian nationals to obtain any non-immigrant visas and prohibits nationals from Libya, Yemen, and Iran from obtaining many kinds of non-immigrant visas.  And like EO-2, the Proclamation is rooted in religious animus, not reasonably related to legitimate national security concerns.

## Facts Relating to the Claims of the Plaintiffs

### Eblal Zakzok

60. Plaintiff Eblal Zakzok ("Zakzok") is a native of Syria and a lawful permanent resident of the United States, who currently resides in Columbus, Ohio.

61. Zakzok attended graduate school at the University of Manchester in the United Kingdom.  In 2008, after obtaining his PhD, he returned to Syria and was employed as a full-time assistant professor at Aleppo University until the beginning of 2014, when Syrian regime security forces detained, beat and tortured him for two weeks.

62. In September 2014, Zakzok and his family fled from Syria to Turkey, to escape the horrific civil war, and to escape further persecution and torture.

63. While his wife and children temporarily remained in Turkey, Plaintiff Zakzok came to the United States on September 30, 2014 to present a paper at an international conference in Michigan and requested asylum.

64. He was granted asylum on December 17, 2014 and was assisted by The Scholar Rescue Fund of the Institute of International Education in obtaining a fellowship at the Ohio State University where he teaches Surveying, Remote Sensing and Geographical Information Systems.

65. Following his successful asylum application, Plaintiff Zakzok's wife and three of his children were granted asylee benefits on January 25, 2016. Shortly thereafter, they traveled to the United States to be reunited with Plaintiff Zakzok.

66. Plaintiff Zakzok's remaining daughter, Turkie Zakzok, was forced to remain in Turkey because she was over 21 at the time he was granted asylum and thus did not qualify for derivative asylum benefits.

67. On August 25, 2017, Plaintiff Zakzok filed a Petition for Alien Relative, Form I-130, seeking approval for his daughter, Turkie, to immigrate to the United States.  The Petition is currently still pending with USCIS.

68. On September 24, 2107, President Trump issued a Presidential Proclamation which bars all Syrians from entering the US on either immigrant or non-immigrant visas after October 18, 2017.

69. The Proclamation will bar Plaintiff Zakzok's daughter from obtaining the immigrant visa she has applied for and will prevent her from immigrating to the United States to be reunited with her father, mother and other siblings.

70. Plaintiff Zakzok's daughter cannot obtain permanent legal residence in Turkey, and is therefore at risk of being returned to Syria, where she could face torture and or death.

71. If allowed to go into effect, the Proclamation will deny Plaintiff Zakzok and his family the ability to be a regular and immediate part of each other's lives.  Additionally, Plaintiff

Zakzok and his daughter will be forced to continue to live with the fear that his daughter

will be targeted by the many criminals in Turkey who specifically target Syrian women.

**Sumaya Hamadmad**

72.  Plaintiff Sumaya Hamadmad ("Hamadmad"), a native of Syria, is a U.S. citizen residing

in Ohio.

73. On October 3, 2017, Hamadmad's sister, a Syrian national currently residing in Amman,

Jordan, applied for a B1/B2 visa to enter the United States in order to visit her siblings

and other relatives and to participate in an academic project with American researchers.

74. Hamadmad's sister's research is for a collaborative project that involves the epigenetics

of transgenerational trauma of Syrian refugees.  She has been the team leader for data

collection of this project in Jordan since 2016 while affiliated with a professor at a

university in Jordan.  Specifically, she has been in charge of identifying, recruiting, and

collecting DNA samples and interview data from all of the families in the study.

75. A U.S. university has invited Hamadmad's sister to provide input on the specifics

regarding the collection of the swab samples and analyses.

76. The Proclamation will prevent Hamadmad's sister from being able to obtain the required

non-immigrant visa and will thus bar her from traveling to the United States for any

reason.  This ban applies to her even though she was born in Jordan and has never been

inside of Syria.

77. Additionally, Hamadmad's husband has filed an I-130 Petition for Alien Relative seeking

approval for his father, who is currently residing in Syria and is a Syrian national, to

immigrate to the United States. Due to the current dangerous situation in Syria, it is

urgent that Hamadmad's father-in-law's application be processed and approved as soon

as possible.   The Proclamation, however, will also prevent Hamadmad's father-in-law from having his application for an immigrant visa approved.

**Fahed Muqbil**

78. Plaintiff Fahed Muqbil is a United States citizen of Yemeni origin.   He grew up in Louisiana and currently resides in Mississippi.   In 2012, Muqbil met and married his wife, a Yemeni national.   They have two daughters.   The youngest daughter was born in Yemen in 2016 with a very serious birth defect and its co-morbid conditions – meningomyelocele (spina bifida), hydrocephalus with VP shunt, Chiari II malformation, neurogenic bladder, hydro nephrosis, infantile spasms, an epilepsy that is very difficult to contract, dysphasia, and worsening vision.

79. After her birth, Muqbil travelled from Yemen to Egypt to seek immediate, emergency treatment for her birth defect.   During this time, her head size increased markedly and her vision begin to worsen.

80. In May 2017, Muqbil left his wife overseas in Egypt in order to bring his baby daughter to the United States.   She was immediately hospitalized at a Children's hospital. The hospital began treating her worsening hydrocephalus, the urinary tract infection, and her seizure disorder.   After three weeks, she was discharged to her father and his family. Two weeks later, she was hospitalized again for increasing seizure activity.   Currently, she is under the care of a neurologist and is on constant medication.   According to her doctors, this type of epilepsy carries a poor neurodevelopmental outcome and that she will have to be closely monitored for the rest of her life.

81. Since her time in the United States, the baby has undergone many life-threatening surgeries.   Her doctors predict more surgeries may be needed. The mother, Muqbil's

wife, has not seen her baby for nearly five months. She was not able to be with her daughter nor could she provide her with care during this time.

82. Muqbil submitted an I-130 petition for his wife in June 2017, and the petition was approved on August 17, 2017. Muqbil and his wife are currently in Egypt in preparation for a visa interview scheduled for October 10, 2017. Their daughter is with his family in Mississippi while they navigate the visa process.  The baby has multiple appointments, medications, and possible emergency room visits.

83. Unless Muqbil's wife's immigrant visa is issued prior to October 18, 2017, she will be indefinitely banned from caring for her baby and reuniting with Muqbil and her family. For the welfare of her baby and family, Muqbil's wife is needed in the United States.

### John Doe #1

84. John Doe #1 is a United States citizen residing in New Jersey.

85. In August 2017, John Doe #1 married a Syrian national in the United States.  John Doe #1's spouse then left the country while he worked to set up their home together and apply for her to come to the United States as an immigrant on the basis of their marriage.

86.  John Doe #1's spouse now resides in Portugal.

87. John Doe #1 intends to bring his wife to the United States but, in light of the Proclamation, it would be futile for him to file an I-130 petition seeking approval for her to immigrate to the United States, as there is no chance such a petition would be adjudicated and a visa issued prior to the Proclamation's categorical immigrant visa ban which comes into effect on October 18, 2017.

### Jane Doe #2

88. Jane Doe #2 is a United States citizen, originally from Syria, and a resident of Maryland.

89. Jane Doe #2's mother entered the United States in June 2016 and became a lawful permanent resident a year later in June 2017.  Jane Doe #2's mother now resides in Maryland with Jane Doe, her husband, and their child.

90. Since Jane Doe #2's mother left for the United States, her father has lived and worked in a Gulf nation. Because of work obligations, Jane Doe #2's father was not ready to come to the United States permanently at the time when his wife, Jane Doe #2's mother, entered the United States and later became a lawful permanent resident.

91. Though living and working abroad, Jane Doe #2's father has entered the United States on a tourist visa multiple times without incident.

92. Jane Doe #2 is now pregnant with her second child, and her father has decided to join his wife, daughter, and grandchildren in the United States permanently.

93. Earlier this year, Jane Doe #2 submitted an I-130 petition seeking approval for her father to immigrate to the United States.

94. USCIS approved the petition submitted by Jane Doe #2 on her father's behalf.

95. Upon receiving that approval, Jane Doe #2's father began his visa application, though he has not yet been interviewed.

96. Because he is seeking an immigrant visa and is a Syrian national, the Proclamation will bar Jane Doe #2's father from entering the United States.

### **Jane Doe #3**

97. Jane Doe #3 is a US citizen residing in Minnesota.

98. Jane Doe #3 is engaged to a Somali foreign national residing in Malaysia, where he has lived since 2008.

99. In late 2016, Jane Doe #3 filed an I-129F Petition with USCIS seeking a K-1 visa for her fiancé. The K-1 visa would permit her fiancé to enter the United States, get married, and pursue permanent residence in the United States.

100. USCIS approved Jane Doe #3's I-129F in March 2017, which then allowed her fiancé to apply to the Department of State for his visa.

101. Jane Doe #3's fiancé has been interviewed by a consular official in Malaysia, has submitted all requested information, and is now eligible for the visa for which he applied.

102. However, Section 2(h)(ii) of the Proclamation provides that the entry into the United States of nationals of Somalia as immigrants is suspended. Because the visa sought is an immigrant visa, Jane Doe #3's fiancé will be prohibited from obtaining a visa because of the Proclamation.

## CAUSES OF ACTION

### COUNT I

**(First Amendment – Establishment Clause)**
**(On behalf of all Plaintiffs)**

103. The foregoing allegations are repeated and incorporated as though fully set forth herein.

104. The Establishment Clause of the First Amendment prohibits the federal government from officially preferring one religion over another, including actions intended to disfavor a religion.

105. Section 2 of the Proclamation and Defendants' actions to implement it are intended to disfavor Islam, and have the effect of disfavoring Islam.

106.     Section 2 of the Proclamation and Defendants' actions to implement it violate the Establishment Clause by singling out Muslims for disfavored treatment that is neither justified by, nor closely fitted to, any compelling governmental interest.

107.     Defendants' violation of the Establishment Clause is causing ongoing and immediate harm to Plaintiffs.

## COUNT II

**(Immigration and Nationality Act & Administrative Procedure Act)**
**(On behalf of all Plaintiffs)**

108.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

109.     The Immigration and Nationality Act provides, with certain exceptions not applicable here, that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A).

110.     Plaintiff Zakzok's daughter has applied for an immigrant visa, but pursuant to Section 2 of the Proclamation, her application will be categorically denied after October 18, 2017. The Proclamation requires denial because of her Syrian nationality, in violation of 8 U.S.C. § 1152(a)(1)(A).

111.     Plaintiff Hamadmad's father-in-law has applied for an immigrant visa, but pursuant to Section 2 of the Proclamation, his application will be categorically denied after October 18, 2017.  The Proclamation requires denial because of his Syrian nationality, in violation of 8 U.S.C. § 1152(a)(1)(A).

112.     Plaintiff Fahed Muqbil's wife has applied for an immigrant visa, but pursuant to Section 2 of the Proclamation, her application will be categorically denied after October

24

18, 2017. The Proclamation requires denial because of her Yemeni nationality, in violation of 8 U.S.C. § 1152(a)(1)(A).

113.     Plaintiff John Doe #1's wife plans to apply applied for an immigrant visa, but pursuant to Section 2 of the Proclamation, her application will be categorically denied after October 18, 2017. The Proclamation requires denial because of her Syrian nationality, in violation of 8 U.S.C. § 1152(a)(1)(A).

114.     Plaintiff Jane Doe #2's father has applied for an immigrant visa, but pursuant to Section 2 of the Proclamation, his application will be categorically denied after October 18, 2017. The Proclamation requires denial because of his Syrian nationality, in violation of 8 U.S.C. § 1152(a)(1)(A).

115.     Plaintiff Jane Doe #3's fiancé has a pending immigrant visa based on her engagement with her fiancé.  Pursuant to Section 2 of the Proclamation, his application will be categorically denied after October 18, 2017. The Proclamation requires such denial because of his Somali nationality, in violation of 8 U.S.C. § 1152(a)(1)(A).

116.     Section 2 of the Proclamation explicitly mandates discrimination against immigrant visa applicants because of their nationality, in violation of 8 U.S.C. § 1152(a)(1)(A).

117.     The actions of Defendants, as set forth above, are arbitrary, capricious, and an abuse of discretion, or are otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)-(D).

## COUNT III

**(Substantive Violation of the Administrative Procedure Act through Violations of the Constitution, Immigration and Nationality Act, and Arbitrary and Capricious Action)**
**(On behalf of all Plaintiffs)**

118.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

119.    The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

120.    In issuing and implementing the Proclamation, Defendants have acted contrary to the Establishment Clause of the United States Constitution.

121.    In issuing and implementing the Proclamation, Defendants have acted contrary to the INA.

122.    Defendants have engaged in nationality-based discrimination, contrary to 8 U.S.C. § 1152(a)(1)(A).

123.    Defendants have violated the INA by establishing an *ultra vires* regime for processing nonimmigrant visa applications. Defendants have upended the extensive and complex vetting scheme crafted by Congress and replaced them with a blunt new regime of bans, requirements, exceptions, and waivers.

124.    Defendants are attempting to set their own standard for admission to the United States. Proclamation at §§ 2(c), 6(a). They also seek to erase a carefully calibrated congressional scheme for vetting visa applicants, including a comprehensive "terrorism

bar," 8 U.S.C. § 1182(a)(3)(B); detailed vetting rules, 8 U.S.C. §§ 1202(b)-(d), 1361; and

exclusions from the Visa Waiver Program, 8 U.S.C. § 1187(a)(12). In short, Defendants

seek to permanently replace an extensive, congressionally-crafted system with its own

warren of waivers and exceptions, imposing burdens on the applicant that are in conflict

with the provisions of the INA.  Proclamation at §§ 3(a)-(c).

125.       Plaintiff Hamadmad's sister has been invited to be a researcher at a top American

university and would otherwise be eligible for a B1/B2 (nonimmigrant) visa, but pursuant

to Section 2 of the Proclamation, her application will be categorically denied after

October 18, 2017.

126.       Plaintiff Jane Doe #3's fiancé has applied for a fiancée visa and would otherwise

be eligible to receive it, but pursuant to Section 2 of the Proclamation, his application will

be categorically denied after October 18, 2017.

127.       In issuing and implementing the Proclamation, Defendants have acted arbitrarily

and capriciously. While Defendants have sought to portray as objective and considered

the process that led to selecting eight countries for sanctions, it is evident that this is not

the case. EO-1 required the Departments of State and Homeland Security to review

"identity-management and information-sharing capabilities, protocols, and practices," but

the decisions on which countries to exclude relied to an unspecified extent on other, less

objective concerns such as a broad-ranging "risk assessment." Even with that subjectivity

built into the process, the Proclamation acknowledges that it did not follow the

conclusions of the review. Iraq was found to have failed the State Department's baseline

standards, but left off the blacklist. Somalia, on the other hand met the standards, but was

nevertheless included. The issuance of all immigrant visas was stopped, even though the

individuals applying for them have the strongest connections to the United States and undergo extraordinary vetting prior to approval. Nor does the Proclamation provide any rationale for why certain categories of visas (primarily tourist and business) are excluded while others (such as students) are permitted. More broadly, the Proclamation purports to protect the country from terrorism, but affects millions of people who have absolutely no connection to terrorism. Through their actions described in this Complaint, Defendants have violated the substantive requirements of the APA. Defendants' violation inflicts ongoing and immediate harm on Plaintiffs.

## **COUNT IV**

**(Procedural Violation of the Administrative Procedure Act)**
**(On behalf of all Plaintiffs)**

128.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

129.    The APA requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

130.    The Departments of State and Homeland Security are "agencies" under the APA. *See* 5 U.S.C. § 551(1).

131.    The APA requires that agencies follow rulemaking procedures before engaging in action that impacts substantive rights. *See* 5 U.S.C. § 553.

132.    In implementing the Proclamation, federal agencies have changed the substantive criteria by which individuals from the targeted countries may enter the United States. This change, among other actions by Defendants, impacts substantive rights.

133.    Defendants did not follow the rulemaking procedures required by the APA in enacting and implementing the Executive Order.

134.     Defendants have violated the procedural requirements of the APA. This violation inflicts ongoing and immediate harm upon Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A.  Declare that Section 2 of the Proclamation is unauthorized by, and contrary to, the Constitution and laws of the United States;

B.  Enjoin the Defendants from implementing or enforcing Section 2 of the Proclamation across the nation;

C.  Award any other relief as the Court may deem just and proper.

Dated:  October 6, 2017                         Respectfully submitted,

/s/ Charles E. Davidow

Charles E. Davidow (Bar #  06516)
   PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
   2001 K Street NW
   Washington, DC 20006-1047
   Tel.: (202) 223-7300
   Fax:  (202) 223-7420
   cdavidow@paulweiss.com

Robert A. Atkins†
Liza Velazquez†
Andrew J. Ehrlich†
Steven C. Herzog†
   PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
   1285 Avenue of the Americas
   New York, NY 10019-6064
   (212) 373-3000
   Tel.: (212) 373-3000
   Fax:  (212) 757-3990
   ratkins@paulweiss.com
   lvelazquez@paulweiss.com
   aehrlich@paulweiss.com
   sherzog@paulweiss.com

Lena F. Masri†
Gadeir Abbas*†
  Council on American-Islamic
  Relations (CAIR)
  453 New Jersey Avenue SE
  Washington, D.C. 20003
  Tel.: (202) 488-8787
  Fax: (202) 488-0833
  lfmasri@cair.com
  gabbas@cair.com

Faiza Patel†
Michael Price†
  Brennan Center for Justice
  at NYU School of Law
  120 Broadway, Suite 1750
  New York, NY 10271
  Tel.: (646) 292-8335
  Fax: (212) 463-7308
  faiza.patel@nyu.com
  michael.price@nyu.com

Jethro Eisenstein†
  Profeta & Eisenstein
  45 Broadway, Suite 2200
  New York, New York 10006
  Tel.: (212) 577-6500
  Fax:  (212) 577-6702
  jethro19@gmail.com

*Counsel for Plaintiffs*

†*Pro hac vice applications forthcoming*
*Licensed in VA; not in DC. Practice
limited to federal matters*