**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

EBLAL ZAKZOK,
FAHED MUQBIL,
JANE DOE #1, and
JANE DOE #2,

    *Plaintiffs,*

  v.

DONALD TRUMP, in his official capacity as
President of the United States,
1600 Pennsylvania Avenue NW
Washington, D.C. 20500;

U.S. DEPARTMENT OF HOMELAND
SECURITY,
Serve on: Kirstjen Nielsen
Secretary of Homeland Security
Washington, D.C. 20528;

U.S. DEPARTMENT OF STATE,
Serve on:
The Executive Office,
Office of the Legal Adviser, Suite 5.600,
600 19th Street NW., Washington DC 20522;

KIRSTJEN NIELSEN
In her official capacity as
Secretary of Homeland Security
Washington, D.C. 20528;

MIKE POMPEO
In his official capacity as Secretary of State
Serve on:
The Executive Office,
Office of the Legal Adviser, Suite 5.600,
600 19th Street NW., Washington DC 20522

    *Defendants,*

Civil Action No.:  17-cv-02969-TDC

**AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

**INTRODUCTION**

1.      Plaintiffs bring this case to challenge the constitutionality and lawfulness of President Donald Trump's September 24, 2017 Proclamation, entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats" (Proclamation No. 9645, 82 Fed Reg. 45,161 (Sept. 24, 2017) (the "Proclamation").

2.      The Proclamation is the most recent of President Trump's efforts to impose a "Muslim ban," prohibiting the entry of individuals from Muslim-majority countries to the United States and fostering discrimination and animus toward Muslims.  The Proclamation, *inter alia*, indefinitely bans virtually all travel to the United States from five Muslim-majority countries.

3.      Defendants have defended the Proclamation by arguing that it was intended to enhance the country's national security.  But the statements of President Trump and his advisors, the President's prior efforts to ban travel by individuals from Muslim-majority countries, and the text and implementation of the Proclamation itself show that the Proclamation was not intended to enhance national security, and that it does not in fact do so.  Defendants' own words and statements demonstrate that the Proclamation is rooted in religious animus and that it is not reasonably related to legitimate national security concerns.

4.      The Proclamation harms Muslim citizens and permanent residents by tearing apart their families and denying them rights that all other Americans are provided by our country's laws and regulations.  The Proclamation bars Muslims' family members from traveling to the United States, and it stigmatizes those Americans by treating them differently from other Americans and by communicating to them — and to all other Americans — that their

religion is immoral, less worthy, and not entitled to the same respect and treatment as other religions.

5.    The Proclamation suffers from the same legal defects as the previous Muslim bans, including by violating the fundamental constitutional guarantee that the Government may not establish or favor one religion over another.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

7.    This Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the APA, 5 U.S.C. § 706.

8.    Venue is proper in this District under 28 U.S.C. §1391(b)(2) and (e)(1).  Defendants are officers or employees of the United States acting in their official capacities and agencies of the United States.  Plaintiff Jane Doe #2 resides in this District.  No real property is involved in this action.

## PARTIES

9.    Plaintiff Eblal Zakzok, Ph.D., is a native of Syria and a lawful permanent resident of the United States, who currently resides in Columbus, Ohio.  Dr. Zakzok teaches Surveying, Remote Sensing and Geographical Information Systems at the Ohio State University.  After he was detained and tortured in Aleppo by the Syrian regime, in 2014, he fled to Turkey and then sought and was granted asylum in the United States.  Dr. Zakzok's wife and four of his five children were granted derivative asylum benefits in 2016 and came to the United States to join him.  However, Dr. Zakzok's eldest daughter, Turkie, was forced to remain in Turkey because she was over 21 years old at the time and therefore not eligible for

derivative asylum benefits.  On August 25, 2017, Dr. Zakzok filed a Petition for Alien Relative, Form I-130, seeking approval for Turkie to immigrate to the United States.  The petition currently is still pending with the U.S. Citizenship and Immigration Services ("USCIS").

10.  Plaintiff Fahed Muqbil is an American citizen of Yemeni descent who currently resides in Mississippi.  In 2012, Mr. Muqbil married a Yemeni national.  Mr. Muqbil's wife submitted an I-130 petition in June 2017, which was approved on August 17, 2017.  Mr. Muqbil's wife received a waiver in January 2018, and entered the country with a green card.  Mr. Muqbil, who is Muslim, feels unwanted, different, and treated unfairly as a result of the Proclamation.

11.  Plaintiff Jane Doe #1 is an American citizen residing in Minnesota.  She is married to a Somali foreign national who received a waiver from the Proclamation and entered the country in February 2018.  Even though her husband was granted a waiver, Jane Doe #1 believes that the Proclamation treats her like a second-class citizen.

12.  Plaintiff Jane Doe #2 is a United States citizen of Syrian descent who currently resides in Maryland with her mother, husband, and two children.  In 2017, Jane Doe #2 submitted an I-130 Petition on behalf of her father, a Syrian national living in a Gulf nation, who seeks to immigrate to the United States and be reunited with his family.  USCIS approved the petition, but her father has not yet been interviewed for his visa application.

13.  Defendant Donald J. Trump is the President of the United States.  In addition to issuing the Proclamation at issue in this action, he issued executive orders on January 27, 2017 and March 6, 2017 banning entry of immigrant and nonimmigrant nationals of certain Muslim-majority countries.

4

14.   Defendant U.S. Department of Homeland Security ("DHS") is a federal cabinet agency responsible for implementing and enforcing the Proclamation at issue in this action.  DHS is a department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f).  USCIS is a component of DHS that is responsible for adjudicating requests for immigration benefits for individuals located within the United States.

15.   Defendant U.S. Department of State is a federal cabinet agency responsible for implementing the Proclamation at issue in this action.  It is a department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f).

16.   Defendant Kirstjen Nielsen is the Secretary of Homeland Security.  Secretary Nielsen has responsibility for overseeing enforcement and implementation of the Proclamation by all DHS staff.  She is sued in her official capacity.

17.   Defendant Mike Pompeo is the Secretary of State and has responsibility for overseeing enforcement and implementation of the Proclamation by all State Department staff.  He is sued in his official capacity.

## STATEMENT OF FACTS

### President Trump's Animus Toward Muslims

18.   President Trump has repeatedly and consistently expressed animus toward Muslims and an irrational fear of Islam.  He has made frequent, explicitly bigoted statements about Muslims and Islam in print, on television, via official statements, and on Twitter.  President Trump's prior executive orders banning travel from Muslim-majority countries and the Proclamation are manifestations of that religious animus.

19.     In 2011, for example, Mr. Trump gave an interview in which he recounted a conversation in which he was asked whether there was "a Muslim problem," to which he responded, "absolutely, yes." Mr. Trump stated his belief that the Quran "teaches some very negative vibe."[1]

20.     Mr. Trump subsequently expressed such sentiments, including by fabricating and disseminating anti-Muslim tropes, throughout his presidential campaign. For example:

   a.   In September 2015, at a campaign event, Mr. Trump seemingly agreed with an audience member's comment that "We have a problem in this country . . . called Muslims."[2]

   b.   In November 2015, Mr. Trump claimed that "thousands and thousands" of Muslims in New Jersey cheered when the World Trade Center collapsed on September 11, 2011.[3]

   c.   In December 2015, Mr. Trump posted the following statement on his campaign website: "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on. According to Pew Research, among others, there is great hatred towards Americans by large segments of the Muslim population. Most recently, a poll from the Center for Security Policy released data showing '25% of those polled agreed that violence against Americans here in the United States is justified as a part of the global

---

[1] David Brody, *Brody File Exclusive: Donald Trump Says Something in Koran Teaches a 'Very Negative Vibe,'* CBN (Apr. 12, 2011), https://www1.cbn.com/thebrodyfile/archive/2011/04/12/brody-file-exclusive-donald-trump-says-something-in-koran-teaches.

[2] Jeremy Diamond, *Donald Trump: Hillary Clinton Started Birther Movement*, CNN (Sept. 21, 2015, 9:11AM), https://www.cnn.com/2015/09/21/politics/donald-trump-hillary-clinton-birther-movement/index html; Jeremy Diamond, *Trump Jokingly Reprimands Supporters in New Hampshire*, CNN (Jan. 5, 2016, 11:37PM), https://www.cnn.com/2016/01/05/politics/donald-trump-guns-new-hampshire/index.html.

[3] *Trump Accused of 'Hate Campaign' After Claiming Thousands Cheered on 9/11*, Guardian (Nov. 22, 2015, 11:34PM), https://www.theguardian.com/us-news/2015/nov/23/donald-trump-accused-of-hate-campaign-after-claiming-thousands-cheered-on-911.

jihad' and 51% of those polled, 'agreed that Muslims in America should have the choice of being governed according to Shariah.'  Shariah authorizes such atrocities as murder against non-believers who won't convert, beheadings and more unthinkable acts that pose great harm to Americans, especially women.  Mr. Trump stated, 'Without looking at the various polling data, it is obvious to anybody the hatred is beyond comprehension.  Where this hatred comes from and why we will have to determine.  Until we are able to determine and understand this problem and the dangerous threat it poses, our country cannot be the victims of horrendous attacks by people that believe only in Jihad, and have no sense of reason or respect for human life.'"[4]

d.  After releasing this statement, Mr. Trump emphasized it at a campaign rally, reading the excerpt that "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what the hell is going on," adding the word "hell" for emphasis.[5]

e.  Also in December 2015, Mr. Trump retweeted a claim that Muslims were burning the U.S. flag after September 11.[6]

f.  In a December 2015 Fox News interview, Mr. Trump characterized Muslims as sick, disease-ridden people:  "There's a sickness. They're [Muslims are] sick people. There's a sickness going on. There's a group of people that is very sick."[7]

[4] *Donald J. Trump Statement on Preventing Muslim Immigration*, (Dec. 7, 2015), https://web.archive.org/web/20151209232647/https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration.
[5] Jenna Johnson, *Trump Calls for 'Total and Complete Shutdown of Muslims Entering the United States,'* Wash. Post (Dec. 7, 2015, 7:43PM), https://www.washingtonpost.com/news/post-politics/wp/2015/12/07/donald-trump-calls-for-total-and-complete-shutdown-of-muslims-entering-the-united-states/?utm_term=.e5ebc71fdb26.
[6]  Donald J. Trump (@realDonaldTrump), Twitter (Dec. 2, 2015, 2:36PM), https://twitter.com/realdonaldtrump/status/672182509111767041.
[7]  Dan Friedman, *Trump Cites 'Sickness' in Defense of Muslim Immigration Ban Proposal*, Wash. Examiner (Dec. 13, 2015), http://www.washingtonexaminer.com/trump-citessickness-

    g.   In February 2016, he claimed that shooting Muslims with bullets dipped in pigs' blood can deter terrorism.[8]

    h.   In March 2016, in an interview aired on CNN, Mr. Trump declared "Islam hates us."[9]

    i.   In a July 2016 NBC interview, Mr. Trump stated that he was not pulling back from his proposed "Muslim ban."  He explained:  "I actually don't think it's a rollback.  In fact, you could say it's an expansion.  I'm looking now at territory.  People were so upset when I used the word 'Muslim.'  'Oh, you can't use the word 'Muslim.'  Remember this.  And I'm okay with that, because I'm talking territory instead of Muslim."[10]

21.    During his presidential campaign, Mr. Trump also advocated for anti-Muslim policies, such as shutting down mosques and registering all Muslims in the United States.  When asked about the possibility of registering or otherwise monitoring Muslims, Mr. Trump promised unprecedented action against Muslims:  "And certain things will be done that we never thought would happen in this country in terms of information and learning about the enemy."[11]

22.    After becoming President, Mr. Trump immediately enacted anti-Muslim policies, consistent with his explicit animus.

---

in-defense-of-muslim-immigration-ban-proposal/article/2578269; *86 Times Donald Trump Displayed or Promoted Islamophobia*, Medium, https://medium.com/nilc/86-times-donald-trump-displayed-or-promoted-islamophobia-49e67584ac10 (last visited September 28, 2018).

[8]  Tessa Berenson, *The Real Story Behind Donald Trump's Pig's Blood Slander*, Time (Feb. 24, 2016), http://time.com/4235405/donald-trump-pig-blood-muslims-story/; Liam Stack, *Trump's Remarks on Pigs' Blood Elicit Challenge From Sister of Chapel Hill Victim*, N.Y. Times (Feb. 22, 2016), https://www.nytimes.com/2016/02/23/us/politics/trump-pigs-blood-sister-chapel-hill-victim-barakat.html.

[9]  Theodore Schleifer, *Donald Trump: 'I Think Islam Hates Us,'* CNN (Mar. 10, 2016), https://www.cnn.com/2016/03/09/politics/donald-trump-islam-hates-us/.

[10] Jenna Johnson, *Donald Trump Is Expanding His Muslim Ban, Not Rolling it Back*, Wash. Post (July 24, 2016), https://www.washingtonpost.com/news/post-politics/wp/2016/07/24/donald-trump-is-expanding-his-muslim-ban-not-rolling-it-back/?utm_term=.47675cf6a6c9.

[11] Jenna Johnson, *Donald Trump Would 'Certainly' and 'Absolutely' Create a Database of Muslims*, Wash. Post (Nov. 20, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/11/20/donald-trump-would-certainly-and-absolutely-create-a-database-of-muslims/?utm_term=.34384a1c41bc.

**EO-1**

23. Within one week of becoming President, on January 27, 2017, President Trump issued an executive order entitled "Protecting the Nation From Foreign Terrorist Entry Into the United States" ("EO-1").  EO-1 temporarily banned entry of immigrant and nonimmigrant nationals of seven predominantly Muslim countries:  Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen.

24. EO-1 discriminated against Muslims on its face.  It contained express preferences for "religious minorities" in the seven Muslim-majority countries targeted by the ban, establishing special benefits only available to individuals who were not Muslim.  Section 5(b) authorized the Secretary of State "to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality."  Because the countries that were the subject of the ban were overwhelmingly Muslim, these religious minorities were non-Muslim people.  Section 5(e) contained a similar explicit preference for individuals who were not Muslim from the seven banned countries.

25. EO-1 also contained a provision requiring the regular collection and publication of information about so-called "honor killings," which research shows is a term used almost exclusively to stigmatize Muslims by portraying violence in the Muslim community as religiously sanctioned.  No research shows a link between international terrorism and so-called "honor killings."

26. President Trump himself confirmed EO-1's discriminatory purpose.  In a Christian Broadcast Network interview on January 27, 2017, the same day he signed EO-1, he affirmed his intent to give priority to persecuted Christians over persecuted Muslims.[12]

27. Rudolph Giuliani, a close advisor of President Trump's, similarly confirmed EO-1's discriminatory purpose.  In discussing EO-1 the day after it was signed, Mr. Giuliani boasted on national television that President Trump had called him regarding a "Muslim ban" and asked Mr. Giuliani to "show [President Trump] the right way to do it legally." Mr. Giuliani said he had formed a commission to achieve the Muslim ban's objectives without referencing religion.[13]

28. Tellingly, the text of EO-1 mirrored language from a speech Mr. Trump made as a presidential candidate, omitting only explicit references to concepts associated with Islam. In an August 2016 speech in Youngstown, Ohio, entitled "Understanding the Threat: Radical Islam and the Age of Terror," Mr. Trump stated:

> "[W]e must also screen out any with hostile attitudes toward our country or its principles, or who believe that Sharia law should supplant American law. Those who do not believe in our Constitution or who support bigotry or hatred will not be admitted for immigration into our country."[14]

Paralleling this speech, Section 1 of EO-1 stated:

> "[T]he United States must ensure that those admitted to this country do not bear hostile attitudes toward it and its founding principles.  The United

---

[12]  Michael D. Shear and Helene Cooper, *Trump Bars Refugees and Citizens of 7 Muslim Countries*, N.Y. Times (Jan. 27, 2017), https://www.nytimes.com/2017/01/27/us/politics/trump-syrian-refugees.html.

[13]  Amy B. Wang, *Trump Asked for a 'Muslim Ban,' Giuliani Says – and Ordered a Commission to do it 'Legally,'* Wash. Post (Jan. 29, 2017), http://wapo.st/2khcw0t?tid=ss_tw&utm_term=.ab2db76b30de.

[14]  *Donald Trump Foreign Policy Speech in Youngstown*, CSPAN (Aug. 15, 2016), https://www.c-span.org/video/?413977-1/donald-trump-delivers-foreign-policy-address.

States cannot, and should not, admit those who do not support the Constitution, or those who would place violent ideologies over American law.  In addition, the United States should not admit those who engage in acts of bigotry or hatred."

29.   Federal courts enjoined EO-1 quickly after it took effect.  *See Washington* v. *Trump*, No. C17-0141-JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017) (enjoining sections 3(c), 5(a)-(c), and 5(e) of EO-1); *Darweesh* v. *Trump*, No. 17 CV 480, 2017 WL 388504 (E.D.N.Y. Jan. 28, 2017) (prohibiting Government from removing individuals pursuant to EO-1); *Aziz* v. *Trump*, No. 1:17 CV 116, 2017 WL 580855 (E.D. Va. Feb. 13, 2017) (granting preliminary injunction of portions of EO-1 on Establishment Clause grounds).

**<u>EO-2</u>**

30.   In response to the injunctions preventing the implementation of EO-1, on March 6, 2017, President Trump rescinded EO-1 and signed a new executive order ("EO-2"), bearing the same title as EO-1 and imposing nearly identical entry bans.  EO-2 temporarily banned entry of immigrant and nonimmigrant nationals of six of the seven predominantly Muslim countries identified in EO-1:  Iran, Libya, Somalia, Sudan, Syria, and Yemen.

31.   EO-2, like EO-1, contained the provision regarding so-called "honor killings."

32.   EO-2 also directed the Department of State and DHS to conduct a "worldwide review" to determine whether additional information would be required from foreign countries to properly adjudicate visa applications.  EO-2 further directed these Departments to "submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals. . . ."

33.   EO-2 had the same discriminatory intent against Muslims as did EO-1.  In fact, a week after signing EO-2, President Trump complained at a rally that it was "a watered-down version" and that he wanted "to go back to the first one and go all the way, which is what [he] wanted to do in the first one."[15]  President Trump subsequently wrote on Twitter that "[t]he Justice Dept. should have stayed with the original Travel Ban, not the watered down, politically correct version they submitted to S.C."[16]

34.   Senior Policy Advisor to the President Stephen Miller similarly confirmed EO-2's discriminatory purpose when he explained that EO-2 preserved the same "basic policy outcome" of EO-1 and that any differences between the two would be "mostly minor technical differences."[17]

35.   Federal courts enjoined EO-2s travel and refugee bans before the order took effect.  *See Int'l Refugee Assistance Project* v. *Trump*, 241 F. Supp. 3d 539 (D. Md. 2017), *aff'd*, 857 F.3d 554, 572 (4th Cir. 2017); *Hawaii* v. *Trump*, 241 F. Supp. 3d 1119 (D. Haw. 2017); *aff'd*, 859 F.3d 741, 756 (9th Cir. 2017).  The U.S. Supreme Court granted certiorari and partially stayed the injunction.  *Trump* v. *Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2086-88 (2017) (per curiam).  EO-2s travel and refugee bans subsequently expired and the U.S. Supreme Court dismissed the case as moot.  *Trump* v. *Int'l Refuge Assistance Project*, 138 S. Ct. 353 (2017).

---

[15]  Katie Reilly, *Read President Trump's Response to the Travel Ban Ruling: It 'Makes Us Look Weak,'* Time (Mar. 16, 2017), http://time.com/4703622/president-trump-speech-transcript-travel-ban-ruling/.
[16] Donald J. Trump (@realDonaldTrump), Twitter (July 5, 2017, 3:29AM), https://twitter.com/realdonaldtrump/status/871675245043888128?lang=en.
[17]  *Trump Adviser Says New Travel Ban will Have 'Same Basic Policy Outcome,'* Fox News (Feb. 21, 2017), http://www.foxnews.com/politics/2017/02/21/trump-adviser-says-new-travel-ban-will-have-same-basic-policy-outcome.html; Taylor Link, *Stephen Miller Admits the New Executive Order on Immigration Ban Is Same as the Old*, Salon (Feb. 22, 2017, 7:30PM), https://www.salon.com/2017/02/22/stephen-miller-admits-the-new-executive-order-on-immigration-ban-is-same-as-the-old/.

## **The Proclamation**

36.     On September 24, 2017, President Trump issued the Proclamation, entitled "Enhancing

Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States

by Terrorists or Other Public-Safety Threats."   The Proclamation effectively makes

indefinite many of the temporary restrictions imposed by EO-1 and EO-2, including

permanently banning individuals from most of the Muslim countries targeted in EO-1 and

EO-2.  It does so purportedly based on the worldwide review mandated by EO-2, with the

asserted national security objective of controlling immigration from countries with

deficient information-sharing practices.

37.     The Proclamation indefinitely bans individuals from five Muslim-majority countries:

Iran, Libya, Somalia, Syria, and Yemen.  The Proclamation initially included a ban on

people from Chad, another Muslim-majority country, which was later lifted by

Defendants.[18]  The Proclamation also bans travel from North Korea, as well as travel by

certain government officials from Venezuela.

38.     The Proclamation provides that foreign nationals affected by the Proclamation's travel

restrictions may be granted a waiver from those restrictions, on a case-by-case basis, if they

satisfy certain delineated criteria.  Section 3(c) provides that a waiver may be granted if a

foreign national demonstrates — on a case-by-case basis, to the satisfaction of the

adjudicating Department of State or DHS official — that "(A) denying entry would cause

the foreign national undue hardship; (B) entry would not pose a threat to the national

security or public safety of the United States; and (C) entry would be in the national interest

---

[18]  Eric Beech, *U.S. Lifts Travel Ban on Chad Citizens: White House*, Reuters (Apr. 10, 2018, 5:45PM),
https://www.reuters.com/article/us-usa-chad-security/u-s-lifts-travel-ban-on-chad-citizens-white-house-idUSKBN1HH3FW.

[of the United States].”  In effect, these criteria — if applied in good faith — permit the granting of a waiver when the alleged security considerations underpinning the Proclamation’s categorical bars, and the statutory authorization for it, are inapplicable in a given case.  Section 3(c) also delineates ten circumstances in which granting waivers “may be appropriate.”

39.  The Proclamation, like EO-1 and EO-2, is driven by religious animus and not reasonably related to legitimate national security considerations.  Tellingly, President Trump and his close advisors repeatedly have refused to disavow his prior discriminatory statements. Moreover, as described below, Defendants’ discriminatory intent is reflected by the Proclamation’s failure to further national security interests, the pretextual nature of the purported worldwide review, the pretextual inclusion of two non-Muslim majority countries in the ban, and the pretextual implementation of the waiver scheme.

40.  On October 17, 2017, this Court granted in part and denied in part Plaintiffs’ motion for a preliminary injunction.  *Int’l Refugee Assistance Project* v. *Trump*, 265 F. Supp. 3d 570, 582 (D. Md. 2017).  The same day, U.S. District Judge Derrick K. Watson of the District of Hawai’i granted a temporary restraining order, which was later converted to a preliminary injunction.  *Hawaii* v. *Trump*, 265 F. Supp. 3d 1140, 1145 (D. Haw. 2017). The Government appealed both decisions, but before either the Fourth or the Ninth Circuits issued decisions, on December 4, 2017, the U.S. Supreme Court stayed the preliminary injunctions, pending disposition of the Government’s appeals.  *Trump* v. *Int’l Refugee Assistance Project*, 138 S. Ct. 542 (2017).  On December 22, 2017, the Ninth Circuit affirmed in part and reversed in part Judge Watson’s decision.  *Hawaii* v. *Trump*, 878 F.3d 662, 673 (9th Cir. 2017).  On February 15, 2018, the Fourth Circuit affirmed this Court’s

decision.  *Int'l Refugee Assistance Project* v. *Trump*, 883 F.3d 233, 274 (4th Cir. 2018).

On June 26, 2018, the Supreme Court reversed the Ninth Circuit's decision granting the

preliminary injunction and remanded the case for further proceedings.  *Trump* v. *Hawaii*,

138 S. Ct. 2392, 2423 (2018).

41.     The Proclamation, which is at issue in this action, currently is in effect and barring

        approximately 138 million Muslim nationals from the United States.[19]

### *The Proclamation Does Not Further National Security Interests*

42.     8 U.S.C. § 1182(f) of the Immigration and Nationality Act, the statutory provision

        authorizing the Proclamation, permits the president to suspend the "entry of any aliens or

        of any class of aliens into the United States [upon a finding that such entry] would be

        *detrimental to the interest of the United States*[.]" (Emphasis added.)

43.     The Proclamation repeatedly asserts a national security rationale.  Yet the Proclamation

        does not further national security interests.

44.     *First*, the purported purpose of the Proclamation — controlling immigration from countries

        with deficient information-sharing practices — is already addressed by the immigration

        system.  Visa applicants bear the burden of showing that the applicant is eligible to receive

        a visa, and the Government can exclude individuals who do not meet that burden.  Absent

        the Proclamation, immigration law thus provides an appropriate mechanism for the

        Government to refuse to issue visas to persons where they, or their country's government,

        fail to present sufficient information to determine whether they present a national security

        risk.  The Proclamation offers no explanation for how this individualized adjudication

        process is flawed.  Moreover, the information-sharing rationale cannot be squared with the

---

[19] *See* Pew Research Ctr., *The Global Religious Landscape* 45-50 (2012).

fact that the Proclamation permits foreign nationals from nearly every banned country to enter on a variety of nonimmigrant visas — documents for which applicants receive *less* vetting than immigrant visas.  There is no plausible national security rationale for drawing such distinctions between immigrant and nonimmigrant visa applications, and admitting aliens as business travelers or tourists but not as students, crewmembers, or exchange visitors.

45.   *Second*, a categorical ban on nationality will not accomplish the Proclamation's supposed goal of addressing "terrorism-related" risks.  DHS has determined that country of citizenship is unlikely to be a reliable indicator of potential terrorist activity.[20]  And not a single American has died in a terrorist attack in the United States at the hand of citizens of Iran, Libya, Somalia, Syria, or Yemen in the past 40 years.[21]

46.   *Third*, the Proclamation establishes waiver criteria that are unrelated to and/or unnecessary for the Proclamation's asserted national security rationale.  Two of the criteria — the undue hardship and national interest prongs — are wholly unrelated to national security.  The third criterion — that the foreign national's entry "would not pose a threat to the national security or public safety of the United States" — was already considered as part of the pre-Proclamation visa vetting process.

---

[20]  Vivian Salama, *DHS Report Disputes Threat From Banned Nations*, AP News (Feb. 24, 2017), https://apnews.com/39f1f8e4ceed4a30a4570f693291c866.
[21]  Uri Friedman, *Where America's Terrorists Actually Come From*, Atlantic (Jan. 30, 2017), https://www.theatlantic.com/international/archive/2017/01/trump-immigration-ban-terrorism/514361/.

***The Worldwide Review Was Pretext***
***to Conceal the Proclamation's Discriminatory Purpose***

47.     The Proclamation is facially inconsistent and contradictory, as reflected by the banned countries that supposedly were identified as the result of the worldwide review mandated by EO-2.

48.     That review was undertaken to enable President Trump to provide what would appear to be a facially legitimate rationale to justify policies that in fact were discriminatory in both purpose and effect.  Although DHS claimed that it had developed a "comprehensive set of criteria" to evaluate the "information-sharing practices, policies, and capabilities" of each of the world's nearly 200 countries, those criteria were applied in a contrived manner that was obviously intended to reverse engineer a ban on the core Muslim-majority countries targeted by EO-1 and EO-2.  For example:

   a.   The Proclamation itself concedes that its "baseline criteria" were, in fact, ignored in banning immigrants from countries that met the criteria and in sparing immigrants from countries that did not.  For instance, Somalia (a majority-Muslim country) was banned, even though it satisfied the criteria.  Iraq was not banned, even though it failed to meet the criteria.[22]

   b.   The Proclamation ignores numerous countries that failed the baseline criteria. Defendants chose to permit immigration from many countries that do not satisfy the baseline criteria and, in particular, do not supply the information that supposedly is "needed" from foreign governments to enable the United States to assess its ability to make informed decisions about foreign nationals applying for visas.[23]

---

[22]   David Bier, *Travel Ban Is Based on Executive Whim, Not Objective Criteria*, Cato Institute (Oct. 9, 2017, 2:07PM), https://www.cato.org/blog/travel-ban-based-executive-whim-not-objective-criteria.
[23]   *Id.*

c.  The Proclamation spares certain countries from the ban based on "certain mitigating factors," but applies them in no logical or coherent fashion, other than to impose a ban on Muslim-majority countries.[24]

### The Inclusion of Non-Muslim-Majority Countries Was Pretext to Conceal the Proclamation's Discriminatory Purpose

49.  The addition to the travel blacklist of two non-majority Muslim countries was a transparent attempt to disguise the Proclamation's anti-Muslim intent.

50.  As a practical matter, very few travelers from those two countries, North Korea and Venezuela, are affected by the ban.  Only a negligible number of North Korean citizens seek to come to the United States because those citizens are generally prohibited from leaving North Korea.  In 2016, for instance, only 109 visas were issued to North Korean nationals, while only 58 visas were issued in 2017.[25]  Indeed, the State Department has recognized that, with respect to North Korea, the Proclamation will have little impact as a practical matter because North Korean travel to the United States was already severely

---

[24] *Id.*

[25] Department of State – Bureau of Consular Affairs, *Table XVII: Nonimmigrant Visas Issued by Classification and Nationality (Including Border Crossing Cards): Fiscal Year 2017*, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2017AnnualReport/FY17AnnualReport%20-TableXVII.pdf (last visited September 28, 2018) (55 nonimmigrant visas issued); Department of State – Bureau of Consular Affairs, *Table III:* Immigrant Visas Issued (by Foreign State of Chargeability or Place of Birth): Fiscal Year 2017, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2017AnnualReport/FY17AnnualReport-TableIII.pdf (last visited September 28, 2018) (3 immigrant visas issued); Department of State – Bureau of Consular Affairs, Table XVIII: Nonimmigrant Visas Issued by Nationality (Including Border Crossing Cards) Fiscal Year 2007-2016, https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY16%20NIV%20Detail%20Table.pdf (last visited September 28, 2018); Department of State – Bureau of Consular Affairs, Table XIV: Immigrant Visas Issued at Foreign Service Posts (by Foreign State Chargeability) (All Categories) Fiscal Years 2007-2016, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2016AnnualReport/FY16AnnualReport-TableXIV.pdf (last visited September 28, 2018) (9 immigrant visas issued).

limited prior to the Proclamation.[26]   And the ban only applies to a small number of Venezuelan government officials and their families, not to ordinary visa applicants.

### *The Waiver Scheme Is Pretext*
### *to Conceal the Proclamation's Discriminatory Purpose*

51.     Defendants have advanced the Proclamation's waiver scheme as evidence that the immigration ban has been cleansed of anti-Muslim animus.

52.     In fact, however, Defendants have operated the waiver scheme in a manner that reveals the Proclamation to be a pretext for excluding Muslims from the United States, rather than a policy tethered to statutory prescriptions and tailored to address national security risks. That is, the waiver scheme is merely "window dressing," such that there really is no waiver process that enables individuals impacted by the Proclamation to enter the United States.[27]

53.     Although the Proclamation establishes a mechanism for affording visa applicants case-by-case consideration of their eligibility for a waiver, Defendants have denied waivers en masse to applicants.   And although the Proclamation identifies ten circumstances under which granting a waiver "may be appropriate," Defendants have denied thousands of waivers to visa applicants who fall within those circumstances.

54.     Consular officials review criteria provided by Defendants with the goal of identifying criteria to determine that the applicant is not eligible to apply for a waiver.[28]   At least one

---

[26] Vanessa Sauter, *Does Trump's North Korea Travel Ban Actually Ban Any North Koreans?*, Lawfare (Sept. 26, 2017, 12:25PM),  https://www.lawfareblog.com/does-trumps-north-korea-travel-ban-actually-ban-any-north-koreans; Zachary Cohen, *North Korea's on Trump's Travel Ban List, But That's Not Likely to Disrupt Diplomacy,* CNN (June 26, 2018, 6:29PM), https://www.cnn.com/2018/06/26/politics/trump-travel-ban-ruling-north-korea/index.html.

[27]  Declaration of Christopher Richardson, Esq., at 10, *Alhabri, et al.,* v. *Miller*, No. 1:18-cv-02435 (E.D.N.Y. June 1, 2018), https://www.scribd.com/document/382035331/Exhibit-A.  The declaration was made by Mr. Richardson based on "all the state department guidance, cables, sample Q's and A's and instructions regarding executing all three orders and had the opportunity to review all those materials."  *Id.* at 4-5.

[28] *Id.* at 11.

consular official was of the understanding that no applicant was to be determined eligible to apply. And even if an applicant satisfies the criteria for a waiver, consular officials are not allowed to exercise their discretion to grant a waiver. Instead, they are required to forward the application to officials inside the United States to either grant or deny the waiver.[29]

55.     Analysis of State Department data appears to corroborate that there is no meaningful waiver process. It shows that, in the first few months after the Proclamation went into effect, Defendants only granted waivers to two percent of eligible applicants — *i.e.*, 579 of 27,129 applicants.[30]

56.     As such, although the Proclamation establishes criteria for granting waivers, Defendants do not actually grant waivers to numerous persons — predominantly Muslims — who satisfy the Proclamation's own terms, including that their entry would not pose national security risks and would be in the United States's national interest.

57.     Moreover, Defendants have not informed visa applicants of the availability of a waiver or mechanism through which they may submit information in support of a waiver application.

58.     This systematic denial of waivers for applicants eligible under the Proclamation's own terms demonstrates that the Proclamation's purpose was to exclude Muslims from the United States, not to address national security risks.

59.     The administration is "hiding" behind the doctrine of consular non-reviewability for the benefit of issuing a Muslim ban.[31]

---

[29] *Id.* at 11.
[30]  Yeganeh Torbati, *U.S. Issued Waivers to Trump's Travel Ban at Rate of 2 Percent, Data Shows*, Reuters (June 26, 2018), https://www.reuters.com/article/us-usa-immigration-ban/us-issued-waivers-to-trumps-travel-ban-at-rate-of-2-percent-data-shows-idUSKBN1JN07T.
[31] Declaration of Christopher Richardson, Esq., at 12, *Alhabri, et al.*, v. *Miller*, No. 1:18-cv-02435 (E.D.N.Y. June 1, 2018), https://www.scribd.com/document/382035331/Exhibit-A.

**The Plaintiffs**

***Eblal Zakzok***

60.    Dr. Zakzok is a native of Syria and a lawful permanent resident of the United States, who

currently resides in Columbus, Ohio.

61.    Dr. Zakzok attended graduate school at the University of Manchester in the United

Kingdom.  In 2008, after obtaining his Ph.D., he returned to Syria and was employed as a

full-time assistant professor at Aleppo University until the beginning of 2014, when Syrian

regime security forces detained and tortured him for two weeks.

62.    After Dr. Zakzok was tortured, in September 2014, he and his family fled from Syria to

Turkey to escape further persecution and torture and the horrific civil war.

63.    While his wife and children temporarily remained in Turkey, Dr. Zakzok came to the

United States on September 30, 2014 to present a paper at an international conference in

Michigan and requested asylum.

64.    He was granted asylum on December 17, 2014 and was assisted by The Scholar Rescue

Fund of the Institute of International Education in obtaining a fellowship at the Ohio State

University where he teaches Surveying, Remote Sensing and Geographical Information

Systems.

65.    Following his successful asylum application, on January 25, 2016, Dr. Zakzok's wife and

four of his five children were granted derivative asylum benefits.  Shortly thereafter, they

traveled to the United States to be reunited with Dr. Zakzok.

66.    Dr. Zakzok's remaining daughter, Turkie, has been forced to remain in Turkey because she

was over 21 at the time he was granted asylum and thus did not qualify for derivative

asylum benefits.

67.     On August 25, 2017, Dr. Zakzok filed a Petition for Alien Relative, Form I-130, seeking approval for Turkie to immigrate to the United States.  That petition is still pending with USCIS.

68.     The Proclamation, which bars all Syrians from entering the United States on either immigrant or non-immigrant visas, bars Turkie Zakzok from obtaining the immigrant visa for which she has applied.  The Proclamation prevents her from immigrating to the United States to be reunited with her parents and siblings, and consequently prevents the family from being a regular part of each other's lives.

69.     Dr. Zakzok's family is distraught at the prospect of being indefinitely or permanently divided.  Dr. Zakzok fears for his daughter's safety in Turkey, where he believes Syrian women are often targeted by criminals.  He also is concerned that his daughter — who is ineligible for permanent residency status in Turkey — may be required to return to Syria, where she would risk being detained and tortured.  Turkie Zakzok has not been to Syria in several years, since she fled the country with her family.

70.     The Proclamation also causes economic strain for Dr. Zakzok's family.  The ban on his daughter's entry imperils her education — she was accepted to the Ohio State University — and her ability to contribute to their family life.  Meanwhile, Dr. Zakzok also must continue to help support his daughter in Turkey.

71.     The Proclamation bans Dr. Zakzok's daughter from the United States on the basis of the same connection to Syria shared by Dr. Zakzok and the rest of his family, who are already in the United States:  The Syrian regime victimized them all, they fled together, and the United States approved permanent legal residency for the rest of the family notwithstanding their contact with the conditions in Syria.

72.   Dr. Zakzok feels that the Proclamation is basically an attack on his religion, Islam, and on all Muslims who want to immigrate to the United States.

### *Fahed Muqbil*

73.   Mr. Muqbil is a United States citizen of Yemeni origin.  He grew up in Louisiana and currently resides in Mississippi.

74.   In 2012, Mr. Muqbil met and married his wife, a Yemeni national.  They have two daughters, both of whom are United States citizens.

75.   Mr. Muqbil submitted an I-130 petition for his wife in June 2017, which was approved on August 17, 2017.  His wife attended a visa interview in Egypt on October 10, 2017.

76.   In January 2018, Mr. Muqbil's wife received a waiver from the Proclamation and was issued a visa.  She entered the United States on January 26, 2018 and is a green card holder.

77.   Because of the Proclamation, Mr. Muqbil's wife was separated from their younger daughter for more than 250 days, during which time Mr. Muqbil's wife was not permitted to travel to the United States and their daughter was too sick to travel out of the United States.  Their daughter was born in Yemen in 2016 with a very serious birth defect and its co-morbid conditions — meningomyelocele (spina bifida), hydrocephalus with VP shunt, Chiari II malformation, neurogenic bladder, hydro nephrosis, infantile spasms, epilepsy, dysphasia, and worsening vision.  In May 2017, after seeking emergency medical treatment abroad for their daughter, Mr. Muqbil left his wife abroad and brought their daughter to the United States to receive treatment for her worsening condition.  In the United States, their daughter was hospitalized on multiple occasions and underwent several life-threatening surgeries — all while Mr. Muqbil's wife was prohibited from traveling to the United States to be with her critically-ill child.

78.     Mr. Muqbil's wife's entry to the United States has not undone the pain he experienced during the period that she was banned.   Nor has it diminished his feelings of marginalization or dissipated the stigma he experiences from being vilified because of his Muslim faith.

79.     The Proclamation makes Mr. Muqbil feel as though he and his fellow American Muslims are unwanted, different, and somehow dangerous merely because of their religion.   He believes the Proclamation paints him and his family as terrorists, and he feels condemned and penalized for practicing Islam.   Mr. Muqbil further believes that the Proclamation renders him a second-class citizen because of his faith, and resulted in the treatment of his wife as a "national security threat," rather than as a mother who simply wanted to care for her family.

***Jane Doe #1***

80.     Jane Doe #1 is a Muslim U.S. citizen residing in Minnesota, where she works as a health care assistant.

81.     Jane Doe #1 is married to a Somali foreign national who received a waiver from the Proclamation and entered the United States on February 21, 2018.

82.     Prior to entering the United States, Jane Doe #1's spouse resided in Malaysia, where he had lived since 2008.

83.     In late 2016, Jane Doe #1 filed an I-129F petition with USCIS seeking a K-1 visa for her then-fiancé.   The K-1 visa would permit her fiancé to enter the United States, get married, and pursue permanent residence in the United States.

84.     USCIS approved Jane Doe #1's I-129F petition in March 2017, which then allowed her fiancé to apply to the Department of State for his visa, which because he received a waiver, he ultimately received.

85.     Jane Doe #1 feels that the Proclamation was motivated by a desire to stigmatize Muslims.
        Despite being entitled to the same rights and legal protections as any other U.S. citizen, the
        Proclamation makes her feel like a second-class citizen on the basis of her Muslim faith.
        She personally feels stigmatized by the Proclamation.

86.     Since the Proclamation was announced, Jane Doe #1 has felt upset and hopeless.  She also
        feels nervous and anxious when interacting with other people.

87.     Jane Doe #1 has noticed people treating her differently since the Proclamation was
        announced.  When people on social media learn that she is from Somalia, they send her
        hurtful messages and question her legal status.  She is afraid to travel because she fears that
        she will be subject to heightened scrutiny or questioning based on the place of birth listed
        on her passport.  She is afraid that she will be isolated and separated from her fellow
        citizens.

### *Jane Doe #2*

88.     Jane Doe #2 is a United States citizen, originally from Syria, and a resident of Maryland.

89.     Jane Doe #2 is married with two children.

90.     Following the birth of her first child in 2016, Jane Doe #2's mother joined her in the United
        States and became a lawful permanent resident the following year.  Jane Doe #2's mother
        now resides in Maryland with Jane Doe #2, her husband, and their two children.

91.     Since Jane Doe #2's mother left for the United States, her father, a Syrian national, has
        lived and worked in a Gulf nation in order to support the family.  He planned to join his
        wife, daughter, and grandchildren in the United States permanently after retiring.

92.     Jane Doe #2's father has entered the United States on tourist visas multiple times without
        incident.

93.  In 2017, Jane Doe #2 submitted an I-130 petition seeking approval for her father to immigrate to the United States.  USCIS approved the petition Jane Doe #2 submitted on her father's behalf, but her father has not yet been interviewed.

94.  However, because he is seeking an immigrant visa and is a Syrian national, the Proclamation bars Jane Doe #2's father from entering the United States.

95.  Jane Doe #2's separation from her father causes her tremendous anguish.  In addition to the anxiety created by the fragmentation of her family, she fears for her father's safety.  Jane Doe #2 and her husband are politically active members of an organization that advocates for a free and democratic Syria.  As her father nears retirement, he may be forced to leave the Gulf nation, where he has a work-based visa.  If her father has to retire but is unable to join his family in the United States, he may be forced to return to Syria, where he could face grave personal risk as a result of Jane Doe #2's political activities.

96.  Jane Doe #2 feels that the Proclamation discriminates against her as a Muslim.  She was naturalized as an American citizen and understood that the Constitution protects people and the rights of religious minorities.  She believes that keeping Muslim families apart, hurting her family because of their Muslim faith, and targeting Muslim-majority countries for exclusion from the United States is inconsistent with those principles.

97.  The Proclamation bars Jane Doe #2's father from entering the United States, purportedly because of conditions in Syria, even though he has not been inside Syria in more than 20 years.

## CAUSES OF ACTION

### COUNT I

**(First Amendment – Establishment Clause)**
**(On behalf of all Plaintiffs)**

98.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

99.     The Establishment Clause of the First Amendment prohibits the federal government from officially preferring one religion over another, including actions intended to disfavor a religion.

100.    Section 2 of the Proclamation and Defendants' actions to implement it are intended to disfavor Islam and have the effect of disfavoring Islam.

101.    Section 2 of the Proclamation and Defendants' actions to implement it violate the Establishment Clause by singling out Muslims for disfavored treatment that is neither justified by, nor closely fitted to, any compelling governmental interest.

102.    Defendants' violation of the Establishment Clause is causing ongoing and immediate harm to Plaintiffs.

### COUNT II

**(Substantive Violation of the Administrative Procedure Act**
**Through Violations of the Constitution)**
**(On behalf of all Plaintiffs)**

103.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

104.    The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)-(C).

105.    In issuing and implementing the Proclamation, Defendants have acted contrary to the Establishment Clause of the United States Constitution.

106.    In issuing and implementing the Proclamation, Defendants have acted arbitrarily and capriciously.  Although Defendants have sought to portray as objective and considered the process that led to selecting eight countries for sanctions, it is evident that this is not the case.  Despite DHS's claim that it developed and applied a "comprehensive set of criteria" to evaluate the "information-sharing practices, policies, and capabilities of foreign governments," the decisions regarding which countries to exclude relied to an unspecified extent on other, less objective considerations.  Even taking into account such subjective considerations, the Proclamation itself acknowledges that, in numerous regards, it did not faithfully follow the conclusions of the review.  More broadly, the Proclamation purports to protect the United States from terrorism, but harms millions of people with absolutely no connection to terrorism.

107.    Through their actions described in this Amended Complaint, Defendants have violated the substantive requirements of the APA.  Defendants' violation inflicts ongoing and immediate harm on Plaintiffs.

## COUNT III

### (Procedural Violation of the Administrative Procedure Act)
### (On behalf of all Plaintiffs)

108.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

109.    The APA requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

110.    The Departments of State and Homeland Security are "agencies" under the APA.  *See* 5 U.S.C. § 551(1).

111.    The APA requires that agencies follow rulemaking procedures before engaging in action that impacts substantive rights.  *See* 5 U.S.C. § 553.

112.    In implementing the Proclamation, federal agencies have changed the substantive criteria by which individuals from the targeted countries may enter the United States.  This change, among other actions by Defendants, impacts substantive rights.

113.    Defendants did not follow the rulemaking procedures required by the APA in enacting and implementing the Executive Order.

114.    Defendants have violated the procedural requirements of the APA.  This violation inflicts ongoing and immediate harm upon Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a.    Declare that Section 2 of the Proclamation is unauthorized by, and contrary to, the Constitution and laws of the United States;

b.    Enjoin the Defendants from implementing or enforcing Section 2 of the Proclamation across the nation;

c.    Award any other relief as the Court may deem just and proper.

Dated:  October __, 2018                     Respectfully submitted,

                                             /s/ Charles E. Davidow

                                             Charles E. Davidow (Bar #  06516)
                                                 PAUL, WEISS, RIFKIND,
                                                 WHARTON & GARRISON LLP
                                                 2001 K Street NW
                                                 Washington, DC 20006-1047
                                                 Tel.: (202) 223-7300
                                                 Fax:  (202) 223-7420
                                                 cdavidow@paulweiss.com

                                             Robert A. Atkins†
                                             Liza Velazquez†
                                             Andrew J. Ehrlich†
                                             Steven C. Herzog†
                                                 PAUL, WEISS, RIFKIND,
                                                 WHARTON & GARRISON LLP
                                                 1285 Avenue of the Americas
                                                 New York, NY 10019-6064
                                                 Tel.: (212) 373-3000
                                                 Fax:  (212) 757-3990
                                                 ratkins@paulweiss.com
                                                 lvelazquez@paulweiss.com
                                                 aehrlich@paulweiss.com
                                                 sherzog@paulweiss.com


                                             Lena F. Masri†
                                             Gadeir Abbas†
                                                 Council on American-Islamic
                                                 Relations (CAIR)
                                                 453 New Jersey Avenue SE
                                                 Washington, D.C. 20003
                                                 Tel.: (202) 488-8787
                                                 Fax: (202) 488-0833
                                                 lmasri@cair.com
                                                 gabbas@cair.com

Faiza Patel†
   Brennan Center for Justice
   at NYU School of Law
   120 Broadway, Suite 1750
   New York, NY 10271
   Tel.: (646) 292-8310
   Fax: (212) 463-7308
   patelf@brennan.law.nyu.edu


Jethro Eisenstein†
   Profeta & Eisenstein
   45 Broadway, Suite 2200
   New York, New York 10006
   Tel.: (212) 577-6500
   Fax:  (212) 577-6702
   jethro19@gmail.com


*Counsel for Plaintiffs*

† *Admitted Pro Hac Vice*