# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. TDC-17-0361 |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |
| IRANIAN ALLIANCES ACROSS BORDERS, UNIVERSITY OF MARYLAND COLLEGE PARK CHAPTER, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. TDC-17-2921 |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |
| EBLAL ZAKZOK, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. TDC-17-2969 |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

In 2017, President Donald J. Trump issued two Executive Orders temporarily banning the entry into the United States, with some exceptions, of nationals of multiple predominantly Muslim nations. These orders were followed by a Presidential Proclamation which extended the ban indefinitely as to immigrants and certain categories of nonimmigrants from a substantially similar set of Muslim-majority countries. Plaintiffs in these three consolidated cases, International Refugee Assistance Project ("IRAP"), HIAS, Inc., Middle East Studies Association ("MESA"), Arab-American Association of New York, Yemeni-American Merchants Association ("YAMA"), Doe Plaintiffs 1–5, Muhammed Meteab, Mohamad Mashta, Grannaz Amirjamshidi, Fakhri Ziaolhagh, Shapour Shirani, and Afsaneh Khazaeli (collectively, "the IRAP Plaintiffs"); Iranian Alliances Across Borders ("IAAB"), Doe Plaintiffs 1, 3, 5 and 6, and Iranian Students' Foundation (collectively, "the IAAB Plaintiffs"); and Eblal Zakzok, Fahed Muqbil, and Doe Plaintiffs 1 and 2 (collectively, "the Zakzok Plaintiffs"), challenge the Proclamation on the grounds that it violates several provisions of the United States Constitution and that the agencies implementing it have not complied with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706 (2012). After the United States Court of Appeals for the Fourth Circuit affirmed a preliminary injunction entered by this Court to prevent the implementation of the Proclamation on the grounds that it violated the Establishment Clause of the First Amendment, the United States Supreme Court reversed a similar preliminary injunction that had been entered in a parallel case, held that the plaintiffs in that case were unlikely to succeed on the merits of their claims, including under the Establishment Clause, and remanded.

The consolidated cases have now been remanded to this Court following the Supreme Court's decision. Presently before the Court is the Motion to Dismiss all three pending amended complaints ("the Complaints") filed by Defendants (the "Government"). On February 12, 2019,

the Court heard oral argument on the Motion. For the reasons set forth below, the Motion will be granted in part and denied in part.

## BACKGROUND

Relevant factual and procedural background is set forth in the Court's March 15, 2017 and October 17, 2017 Memorandum Opinions. *Int'l Refugee Assistance Project v. Trump*, 241 F. Supp. 3d. 539, 543–48 (D. Md.), *aff'd in part and vacated in part*, 857 F.3d 554 (4th Cir.), *judgment vacated*, 138 S. Ct. 353 (2017); *Int'l Refugee Assistance Project v. Trump* ("*IRAP I*"), 265 F. Supp. 3d 570, 583–93 (D. Md. 2017), *aff'd*, 883 F.3d 233 (4th Cir. 2018), *judgment vacated*, 138 S. Ct. 2710 (2018). Limited additional facts and procedural history specific to the Motion are provided below.

## I.    The Proclamation

On September 24, 2017, President Donald J. Trump issued Proclamation No. 9645, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats" (the "Proclamation"), 82 Fed. Reg. 45161 (Sept. 27, 2017). The Proclamation was the third iteration of the President's efforts to ban the entry of nationals from certain predominantly Muslim countries into the United States. *See* Exec. Order 13,769, "Protecting the Nation from Foreign Terrorist Entry into the United States" ("EO-1"), 82 Fed. Reg. 8977 (Jan. 27, 2017); Exec. Order 13,780, "Protecting the Nation from Foreign Terrorist Entry into the United States" ("EO-2"), 82 Fed. Reg. 13209 (Mar. 9, 2017).

Preceding EO-1, EO-2, and the Proclamation, President Trump, as a presidential candidate, president-elect, and President, repeatedly made public statements describing his intention to ban entry of Muslims to the United States and otherwise evincing fear of and prejudice against Muslims. *See IRAP I*, 265 F. Supp. 3d at 585–86, 589–90. For example, on December 7,

2015, then-presidential candidate Trump posted a statement on his campaign website in which he "call[ed] for a total and complete shutdown of Muslims entering the United States until our representatives can figure out what is going on." IRAP 2d Am. Compl. ¶ 55, ECF No. 203, No. TDC-17-0361; IAAB 2d Am. Compl. ¶ 28, ECF No. 78, No. TDC-17-2921; Zakzok Am. Compl. ¶ 20, ECF No. 62, No. TDC-17-2969. On March 9, 2016 during a televised interview, he stated: "I think Islam hates us" and "We can't allow people coming into this country who have this hatred of the United States . . . and [of] people that are not Muslim." IRAP 2d Am. Compl. ¶ 60; IAAB 2d Am. Compl. ¶ 32; Zakzok Am. Compl. ¶ 20. On July 25, 2016, President Trump clarified that he would accomplish his Muslim ban by barring entry from certain "territories" because "people don't want me to say Muslim." IRAP 2d Am. Compl. ¶ 76; IAAB 2d Am. Compl. ¶ 34-35; Zakzok Am. Compl. ¶ 27. Shortly after President Trump signed EO-1 on January 27, 2017, Rudolph Giuliani, an advisor to President Trump, stated that it was the product of an effort directed by President Trump to put the "Muslim ban" into effect "legally" by using territory as a proxy for religion. IRAP 2d Am. Compl. ¶ 65; IAAB 2d Am. Compl. ¶ 39; Zakzok Am. Compl. ¶ 27.

After EO-1 was rescinded and EO-2 went into effect, President Trump called EO-2 a "watered down" version of EO-1. IRAP 2d Am. Compl. ¶¶ 186, 190; IAAB 2d Am. Compl. ¶ 54; Zakzok Am. Compl. ¶ 33. Even after EO-2 was enjoined by courts, President Trump expressed his intent to issue a third travel ban for the same purpose by stating on June 5, 2017 that the Justice Department "should have stayed with the original Travel Ban, not the watered down, politically correct version" and that there should be a "much tougher version." IRAP 2d Am. Compl. ¶ 190. On September 24, 2017, President Trump issued the Proclamation.

The Proclamation states that "absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States" of nationals from Chad, Iran, Libya, North Korea, Somalia, Syria, Venezuela, and Yemen (the "Designated Countries") "would be detrimental to the interests of the United States." Procl. pmbl. Specifically, the Proclamation suspends the entry of all immigrants from seven of the eight Designated Countries, excepting only Venezuela. The ban on entry by nonimmigrants is "more tailored," with a narrower ban imposed on countries with mitigating circumstances such as a willingness to play a substantial role in combating terrorism. *Id.* § 1(h)(iii).

As justification for the ban, the Proclamation references a July 9, 2017 report by the Acting Secretary of Homeland Security, issued pursuant to the requirements of EO-2, describing a "worldwide review" conducted in consultation with the Secretary of State and the Director of National Intelligence. In that review, these officials selected baseline criteria for assessing the sufficiency of the information provided by foreign governments to permit the United States to confirm the identities of individuals seeking to enter the country and make a security assessment about them. *Id.* § 1(c); *see IRAP I*, 265 F. Supp. 3d at 590–91.

According to the Proclamation, pursuant to the process set forth in EO-2, nearly 200 countries were evaluated based on the criteria. Of those, 16 nations were found to be "inadequate" and 31 were found to be at risk of becoming so. In accordance with Section 2(d) of EO-2, those nations were given 50 days to bring their information-sharing practices into compliance with the United States's expectations. At the end of that 50-day period, eight countries were determined to have continued inadequate information-sharing practices: Chad, Iran, Iraq, Libya, North Korea, Syria, Venezuela, and Yemen. In a September 15, 2017 report to the President ("the DHS Report"), the Acting Secretary of Homeland Security recommended that entry restrictions be

imposed on all of those countries with the exception of Iraq. Although Somalia's information-sharing practices were found to be adequate, the Acting Secretary of Homeland Security recommended that Somalia also be subjected to entry restrictions. Venezuela is the only designated country for which entry of immigrants is not suspended. Limitations on the entry of Venezuelan nationals are confined to barring entry of specific government officials and their immediate family members, who are suspended from traveling to the United States on B-1, B-2, and B-1/B-2 visas.

In addition to providing exceptions for lawful permanent residents, dual nationals if traveling on a passport issued by a non-designated country, and foreign nationals who have been granted asylum status or who have been already admitted to the United States as refugees, the Proclamation provides for waivers, to be granted on a case-by-case basis by either a State Department consular officer or an official of United States Customs and Border Protection ("CBP"), based on criteria to be developed by the Secretary of State and the Secretary of Homeland Security. The Proclamation expressly provides that waivers may be granted only upon a showing that (1) denying entry would cause the foreign national undue hardship; (2) allowing entry would not pose a national security or public safety threat; and (3) entry would be in the national interest.

The Proclamation went into effect when it was published as to foreign nationals then barred by EO-2. For all other covered foreign nationals, it became effective on October 18, 2017. On April 10, 2018, Chad was removed from the list of Designated Countries.

## II.     Procedural History

In October 2017, the IRAP Plaintiffs, later joined by the IAAB and Zakzok Plaintiffs, moved for preliminary injunctive relief from the Proclamation. On October 17, 2017, the Court

granted a preliminary injunction primarily on the grounds that Plaintiffs were likely to succeed on their claim that the Proclamation violates the Establishment Clause. *IRAP I*, 265 F. Supp. at 629. The preliminary injunction barred the enforcement of most provisions in Section 2 of the Proclamation, which directed the suspension of entry of nationals of the Designated Countries, except with respect to those individuals who lack a bona fide relationship with a person or entity in the United States. *Id.* at 633.

On the same day, the United States District Court for the District of Hawaii also enjoined enforcement of the Proclamation in a separate case, on the grounds that Plaintiffs were likely to succeed on their claim that the Proclamation exceeded the scope of the President's statutory authority under the Immigration and Nationality Act ("INA"), specifically the authority contained in 8 U.S.C. §§ 1182(f) and 1185, and violated a separate provision of the INA, 8 U.S.C. § 1152(a)(1)(A), which bars discrimination on the basis of nationality in the issuance of immigrant visas. *Hawaii v. Trump*, 265 F. Supp. 3d 1140, 1158-59, 1161 (D. Haw.), *aff'd in part and vacated in part*, 878 F.3d 662 (9th Cir. 2017), *rev'd*, 138 S. Ct. 2392 (2018). On December 4, 2017, the Supreme Court stayed the injunctions pending disposition of the cases by the United States Courts of Appeals for the Fourth and Ninth Circuits, as well as pending any review of the circuit court rulings by the Supreme Court. *Trump v. Int'l Refugee Assistance Project*, 138 S. Ct. 542 (2017); *Trump v. Hawaii*, 138 S. Ct. 542 (2017). On December 22, 2017, the Ninth Circuit affirmed the preliminary injunction entered by the District of Hawaii but stayed its ruling in light of the Supreme Court's December 4, 2017 stay order. *Hawaii v. Trump* ("*Hawaii I*"), 878 F.3d 662, 702 (9th Cir. 2017), *rev'd*, 138 S. Ct. 2392 (2018). The Supreme Court granted the Government's petition for a writ of certiorari in that case on January 19, 2018. *Trump v. Hawaii*, 138 S. Ct. 923 (2018). On February 15, 2018, the Fourth Circuit affirmed this Court's grant of a

preliminary injunction in *IRAP I* but also stayed its decision in light of the Supreme Court's stay. *Int'l Refugee Assistance Project v. Trump* ("*IRAP II*"), 883 F.3d 233, 274 (4th Cir. 2018), *judgment vacated*, 138 S. Ct. 2710 (2018). On March 9, 2018, the Government filed a petition for a writ of certiorari in *IRAP II*. Pet. Writ Cert., *Trump v. Int'l Refugee Assistance Project*, No. 17-1270, 2018 WL 1419884 (U.S. Mar. 9, 2018).

While the petition was pending, on June 26, 2018, the Supreme Court reversed the Ninth Circuit in *Trump v. Hawaii* ("*Hawaii II*"), 138 S. Ct. 2392, 2423 (2018). In *Hawaii II*, the Supreme Court held that the Proclamation did not exceed the President's statutory authority in 8 U.S.C. § 1182(f) and did not violate 8 U.S.C. § 1152(a)(1)(A). *Id.* at 2412, 2415. The Court also concluded that the plaintiffs had not demonstrated a likelihood of success on their claim that the Proclamation violated the Establishment Clause. *Id.* at 2415, 2423. On June 28, 2018, the Supreme Court granted the Government's petition for a writ of certiorari in *IRAP II*, vacated the judgment of the Fourth Circuit, and remanded these cases to the Fourth Circuit for further proceedings in light of *Hawaii II*. *Int'l Refugee Assistance Project v. Trump*, 138 S. Ct. 2710 (2018). On October 2, 2018, the Fourth Circuit, in turn, remanded the case to this Court for proceedings consistent with the Supreme Court's decision. *Int'l Refugee Assistance Project v. Trump*, 905 F.3d 287 (4th Cir. 2018).

### III. The Amended Complaints

On remand, Plaintiffs continue to challenge the Proclamation, but have modified their claims. Following the Supreme Court's decision in *Hawaii II*, the IRAP Plaintiffs voluntarily dismissed their claims, brought under the INA and the APA, that the Proclamation violated 8 U.S.C. § 1182(f) and § 1152(a)(1)(A), as well as their claims that the Proclamation violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb (2012), and the Refugee Act, 8 U.S.C.

§ 1157 (2012). On November 2, 2018, this Court granted the IAAB Plaintiffs and the Zakzok Plaintiffs leave to amend their complaints. Across the three Complaints, Plaintiffs collectively have named the following Defendants: President Trump, the U.S. Department of State ("State Department"), the U.S. Department of Homeland Security ("DHS"), the Office of the Director of National Intelligence, the Secretary of State, the Attorney General, the Secretary of Homeland Security, the Director of National Intelligence, the Commissioner of CBP, and the Director of U.S. Citizenship and Immigration Services.

All Plaintiffs bring claims under the APA alleging that the Proclamation and the actions taken by the implementing agencies do not comply with the substantive and procedural requirements of the APA (the "APA Claims"). Specifically, Plaintiffs assert that the issuance and implementation of the Proclamation was arbitrary and capricious, or an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A), and that it was issued "without observance of procedure required by law," including the following of rulemaking procedures, in violation of 5 U.S.C. §§ 706(2)(D) and 553.

All Plaintiffs also continue to assert that the Proclamation violates the Establishment Clause. The IRAP and IAAB Plaintiffs further assert claims that the Proclamation violates the equal protection and procedural due process components of the Due Process Clause of the Fifth Amendment. Finally, the IAAB Plaintiffs assert that the Proclamation also violates the First Amendment rights to freedom of speech and freedom of association. Together, these claims will be referred to as the "Constitutional Claims." All Plaintiffs seek declaratory and injunctive relief.

In support of their claims, Plaintiffs describe in great detail President Trump's statements expressing his intent to institute a Muslim ban by barring entry of individuals from predominantly Muslim territories and his "explicitly bigoted statements about Muslims and Islam," including

9

statements surrounding the implementation of EO-1, EO-2, and the Proclamation. Zakzok Am. Compl. ¶ 18; *see IRAP I*, 265 F. Supp. 3d at 585–86, 589–90. Plaintiffs allege that the Proclamation bears no rational relationship to the national security interests it purports to further and identify features of the Proclamation's design, its exceptions, its failure to justify itself, and the waiver process in support of their theory.

First, Plaintiffs argue that the design of the Proclamation provides proof that it does not further its supposed national security purposes. The Zakzok Plaintiffs allege that a nationality-based ban will not reduce terrorism risks, because DHS has concluded that country of citizenship is not a reliable predictor of the risk of terrorist activity and no Americans have died from a terrorist attack in the last 40 years based on the actions of citizens of five of the eight Designated Countries. The IAAB Plaintiffs allege that the use of the INA's Visa Waiver Program, 8 U.S.C. § 1187, to evaluate which countries to include in the ban is an irrational baseline because the purposes of and concerns underlying the Visa Waiver Program and the Proclamation are divergent.

According to the IAAB and Zakzok Plaintiffs, the Proclamation's departures from the purported results of the baseline test, by including or exempting certain countries from the list of Designated Countries even if they failed or passed the baseline test, evidence that the Proclamation furthers not national security interests, but other unidentified concerns. Similarly, Plaintiffs assert that the exceptions to the visa suspensions are not rationally related to any national security measure. The Zakzok Plaintiffs contend that because the Proclamation allows foreign nationals from the Designated Countries to enter the United States on some nonimmigrant visas, for which they receive less vetting, it does not actually accomplish increased information sharing between the Designated Countries and the United States. The IRAP and IAAB Plaintiffs

allege that the Proclamation's exceptions for certain foreign nationals and certain countries react to "legal challenges and public condemnation" originating with EO-1 and EO-2 and thus are not founded in any national security policy. IRAP 2d Am. Compl. ¶ 210.

Next, Plaintiffs assert that the Proclamation's duplication of other programs under the INA and its failure to explain why its measures are necessary demonstrate that it is not related to national security concerns. Plaintiffs emphasize that the Proclamation does not explain what specific "visa vetting failures" or other factors led DHS to recommend suspending immigration from the Designated Countries or suspending only certain types of visas from certain countries, when it admits that other, unidentified countries could have been included under the terms of DHS's review. *Id.* ¶ 213. The IAAB and Zakzok Plaintiffs add to this allegation that the Proclamation does not explain why the suspension of immigrants is required to supplement or supersede the INA's current method for processing visa applicants from countries with deficient information sharing.

Finally, Plaintiffs assert that other features of the Proclamation demonstrate its discriminatory purpose. Plaintiffs claim that North Korea and Venezuela, two non-Muslim-majority countries, were included among the list of affected countries for the first time to cover up the discrimination against Muslims, because the Proclamation has a negligible practical effect on foreign nationals from those countries. The IAAB and Zakzok Plaintiffs allege in detail that the waiver process, which would exempt individuals from the terms of the Proclamation on a case-by-case basis, masks the Proclamation's discrimination against Muslims. They note that the waiver criteria, "if applied in good faith," would allow the entry of those foreign nationals who do not trigger the national security concerns referenced in the Proclamation. Zakzok Am. Compl. ¶ 38. However, the waiver criteria are either "wholly unrelated to national security" or were

considered in the visa vetting process that was in place before the Proclamation was issued. *Id.* ¶ 45. They assert that the State Department and DHS have established no process to apply for waivers, informed applicants that legal services can play no role in facilitating the waiver process, and published no guidance implementing the waiver proceedings, as required by the Proclamation. They further state that as of April 30, 2018, only two percent of applicants had been cleared for waivers, many applicants who met the requirements set out in the Proclamation have been denied waivers, and the State Department has not made information available showing how many waivers have actually been granted. They allege that consular officials have been instructed to find applicants ineligible for waivers, and if they are considering a waiver, that they must refer the application to other officials in Washington, D.C. who will decide if a waiver should issue. These allegations, they argue, establish that the waiver process is a "sham" and simply acts to "paper over" the discriminatory animus against Muslims in, and the lack of national security justification for, the Proclamation. IAAB 2d Am. Compl. ¶ 86; *see* Zakzok Am. Compl. ¶ 52.

## DISCUSSION

In its Motion, the Government asserts multiple arguments for dismissal of Plaintiffs' claims. As threshold matters, the Government, while conceding that at least one of the IAAB Plaintiffs has constitutional standing to pursue the asserted claims, takes the position that the IRAP and Zakzok Plaintiffs lack standing. The Government also broadly argues that any statutory claims are not subject to judicial review under the doctrine of consular nonreviewability and related principles.

As to the APA Claims, the Government argues that the Proclamation is not subject to APA review because (1) presidential action is not reviewable under the APA; (2) Plaintiffs have not

identified a "final" agency action to be reviewed, 5 U.S.C. § 704; (3) the action here was "committed to agency discretion by law," *id.* § 701(a)(2); and (4) Plaintiffs do not meet statutory standing requirements, *see id.* § 702. The Government further argues that the APA claim that the Proclamation was "arbitrary and capricious" is foreclosed by the Supreme Court's finding in *Hawaii II* that the Proclamation satisfies constitutional rational basis review, and that the separate APA claim that the Proclamation and its implementation violated the procedural requirements of the APA fails because the foreign affairs exception to notice-and-comment rulemaking applies, *see id.* § 553(a)(1). As to the Constitutional Claims, the Government argues that all claims must be dismissed in light of *Hawaii II*, which held that the Proclamation satisfies rational basis review, that Plaintiffs do not have a cognizable liberty or property interest upon which to base their due process claim, and that Plaintiffs have not alleged a violation of their own rights for the purposes of their Establishment Clause and equal protection claims.

## I.      Legal Standard

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Courts are permitted, however, to consider documents attached to a motion to dismiss "when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs

do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)). Although the Proclamation itself is not attached to the Complaints, all Plaintiffs refer to and explicitly rely on the Proclamation throughout their Complaints. The Court will therefore consider the Proclamation in ruling on the Motion to Dismiss.

## II.     Justiciability

In broadly asserting that Plaintiffs' claims are not justiciable, the Government largely recycles arguments it made in opposing the Motion for a Preliminary Injunction that were rejected by this Court. Although the Government allows that at least one IAAB Plaintiff has standing, it states in a footnote that it does not agree that the IRAP and Zakzok Plaintiffs have standing. To the extent that these cases remain distinct, this Court has previously held, in ruling on the Motion for a Preliminary Injunction, that several IRAP Plaintiffs, including several individuals and the organizations IRAP, MESA, and YAMA, had standing to assert statutory claims and that likewise certain individual IRAP Plaintiffs had standing to assert an Establishment Clause claim. *IRAP I*, 265 F. Supp. 3d at 595–600. The Court also found that several Zakzok Plaintiffs had standing, including Zakzok and Jane Doe No. 2, both of whom had standing to assert constitutional and statutory claims. *Id.* at 596, 601. Zakzok and Jane Doe No. 2 remain as Defendants in the Zakzok Amended Complaint with substantially similar allegations relating to their basis for standing.

While the Supreme Court vacated the parallel injunction issued in *Hawaii II* on the merits, its opinion does not provide a basis to revisit or alter this Court's prior standing analysis. Rather, the Supreme Court explicitly found standing to assert an Establishment Clause claim, holding that "a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact" and stating that "an American individual who has a

14

bona fide relationship with a particular person seeking to enter the country . . . can legitimately claim concrete hardship if that person is excluded." *Hawaii II*, 138 S. Ct. at 2416. Where the Supreme Court's only discussion of standing in *Hawaii II* is consistent with this Court's analysis in *IRAP I*, and the Government has offered no basis to question the applicability and validity of that analysis, the Court reaffirms its prior conclusion that there is standing in all three cases. *IRAP I*, 265 F. Supp. 3d at 595–602.

Relatedly, the Court has already considered and rejected the Government's argument that Plaintiffs may not assert an APA claim because they were not "adversely affected or aggrieved by agency action within the meaning of the relevant statute." 5 U.S.C. § 702; *see Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs* ("*LAVAS*"), 45 F.3d 469, 471 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996). In *IRAP I*, the Court addressed this issue and concluded that Plaintiffs were within the "zone of interests of the INA" and were adversely affected by the denial of visas to family members of individual plaintiffs and to individuals expected to attend conferences hosted by organizational plaintiffs. *IRAP I*, 265 F. Supp. 3d at 603; *see also Hawaii I*, 878 F.3d at 681–82 (concluding that the plaintiffs fell within the zone of interests protected by the INA); *IRAP II*, 883 F.3d at 286 (Gregory, C.J., concurring); *id.* at 310 (Keenan, J., concurring). The Supreme Court did not address this issue in *Hawaii II* and thus has provided no basis to revisit this Court's prior determination on this point.

The Government also reasserts its claim that the Court may not review Plaintiffs' statutory claims because of the doctrine of consular nonreviewability. The Court, however, held during the preliminary injunction proceedings that consular nonreviewability does not bar Plaintiffs' claims, because the doctrine precludes review of individual visa determinations, while Plaintiffs challenge "the overarching travel ban policy imposed by the Proclamation." *IRAP I*, 265 F. Supp.

3d at 602–03. Although the Fourth Circuit, on appeal, did not address this particular issue, two judges, in concurring opinions, reached the same conclusion. *See IRAP II*, 884 F.3d at 279 (Gregory, C.J., concurring); *id.* at 309 (Keenan, J., concurring). Notably, this Court's conclusion was consistent with the Ninth Circuit's holding in *Hawaii* that consular nonreviewability did not bar statutory challenges to the Proclamation. *Hawaii I*, 878 F.3d at 679–80. In *Hawaii II*, the Supreme Court provided no basis to alter either the Ninth Circuit's or this Court's conclusion. While acknowledging that the Government's argument "presents a difficult question," the Court assumed "without deciding" that neither consular nonreviewability nor "any other statutory nonreviewability issue" precluded judicial review. *Hawaii II*, 138 S. Ct. at 2407. This Court therefore finds no reason to revisit its determination that doctrines such as consular nonreviewability do not bar consideration of Plaintiffs' claims.

## III. APA

Plaintiffs challenge the implementation of the Proclamation pursuant to the APA, which provides that:

> The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be —
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]
> (D) without observance of procedure required by law . . . .

5 U.S.C. § 706(2).

In addition to the threshold issues discussed above, the Government asserts that the APA Claims must be dismissed on multiple grounds, including that (1) presidential action is not reviewable under the APA; (2) Plaintiffs have not identified a "final" agency action to be

reviewed, *id.* § 704; and (3) the action here was "committed to agency discretion by law," *id.* § 701(a)(2).

## A. Presidential Action

The Government argues that review of the APA Claims is not available because Plaintiffs challenge the Proclamation, which was issued by the President, who is not subject to APA review. It is firmly established that presidential action is not subject to APA review. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992). Although Plaintiffs correctly note that they have named federal agency officials as Defendants as well, the Government argues that the bar on APA review of presidential action extends to agency actions taken under a delegation of presidential authority, citing *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012), in which the district court held that an APA challenge to import restrictions imposed by the State Department and CBP was improper because those agencies were exercising delegated authority from the President, whose authority derived from a statute. *Id.* at 404. On appeal, however, the Fourth Circuit did not endorse the view that APA review of agency action is unavailable when the agency acts at the direction of the President and instead conducted an APA review and affirmed on the grounds that the action was not arbitrary and capricious. *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 698 F.3d 171, 183–84 (4th Cir. 2012). The Government has identified no other authority in support of this proposition.

By contrast, courts regularly apply APA review to agency actions taken in direct response to a presidential directive, such as an Executive Order. For example, when President Obama issued an Executive Order directing the National Institutes of Health ("NIH") to conduct human stem-cell research, the resulting NIH Guidelines for Human Stem Cell Research were properly

17

the subject of APA review for failure to follow procedural requirements. *Sherley v. Sebelius*, 689 F.3d 776, 780, 784–85 (D.C. Cir. 2012). Likewise, in *Zhang v. Slattery*, 55 F.3d 732 (2d Cir. 1995), after President George H.W. Bush issued an Executive Order directing enhanced consideration for asylum candidates who fear persecution for defying China's one-child policy, the resulting final rule published by the Attorney General was reviewed for compliance with the rulemaking requirements of the APA. *Id.* at 740, 743–45. Most recently, in *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219 (9th Cir. 2018), after President Trump issued a proclamation under 8 U.S.C. § 1182(f) aimed at preventing immigrants who did not enter the United States through ports of entry from seeking asylum, the court conducted APA review of an interim final rule issued by the Department of Justice and DHS implementing that policy with reference to the proclamation. *Id.* at 1236–37, 1251–52; *see also City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997) (holding that an agency's findings of compliance with requirements of Executive Orders directing agencies to minimize the adverse effects of federal action on wetlands were subject to arbitrary and capricious review under the APA).

Here, the actions of the State Department and DHS to implement the Proclamation were taken at the direction of the President, based on statutory authority specific to the President, rather than an agency, to suspend the entry of certain classes of foreign nationals. *See* 8 U.S.C. § 1182(f). In light of the foregoing precedent, the Court declines to find that APA review of the implementation of the Proclamation is foreclosed because the agency action was taken in response to presidential action.

## B. Final Agency Action

The Government further argues that even if APA review may be conducted on agency actions flowing from the Proclamation, Plaintiffs have not identified any "final agency action"

reviewable under the APA. Under the APA, judicial review is available for an "agency action made reviewable by statute" or for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. An action is final if it is both (1) "the consummation of the agency's decisionmaking process," not a "tentative or interlocutory" decision; and (2) a decision "by which rights or obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). In the pending Complaints, Plaintiffs have identified two categories of final agency action: (1) action by the State Department and DHS preceding the Proclamation, particularly actions taken during the worldwide review referenced in the Proclamation; and (2) actions by those departments taken after the issuance of the Proclamation to implement its directives.

### 1.    Pre-Proclamation Agency Action

In the first category, the IAAB Plaintiffs list as "final agency action" the recommendations and acts that the State Department and DHS took before the issuance of the Proclamation, including the "creation of a baseline criteria," the "collection of data," and the "identification of various countries as inadequate" under the baseline criteria. IAAB 2d Am. Compl. ¶ 120. The Zakzok Plaintiffs also name pre-Proclamation actions by the agencies, including DHS's development and application of criteria to evaluate "the information-sharing practices, policies, and capabilities of foreign governments," as violating the APA. Zakzok Am. Compl. ¶ 106.

Such actions taken to provide information and data to aid in the making of a presidential decision do not qualify as "final agency action." 5 U.S.C. § 704. In *Franklin*, the Supreme Court clarified the meaning of "final agency action" in the context of the making of a decision reserved by law to the President. 505 U.S. at 796–97. There, the President, pursuant to a statutory requirement, transmitted to Congress a statement with both the raw results of the census and the

resulting number of seats in the House of Representatives for each state going forward, based on 1990 decennial census data provided in a report from the Secretary of Commerce. *Id.* at 792. Massachusetts asserted an APA challenge to the reapportionment of congressional seats on the grounds that the Secretary of Commerce had improperly allotted overseas federal employees to state populations based on their "home of record" designation, which was a deviation from prior years' practice. *Id.* at 794–95. Because the number of representatives was fixed not by the Secretary of Commerce's report, but by the President's statement to Congress, the Secretary's action was not a "final agency action," and the President's action was not reviewable under the APA because he was not an "agency." *Id.* at 797–98, 800–01. The Court reasoned that while a final action has a "sufficiently direct and immediate" impact and "direct effect" on "day-to-day business," an action that is "tentative" or consists of "the ruling of a subordinate official" is not final. *Id.* at 797 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 151, 152 (1967)). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Id.*

Likewise, in *Dalton v. Specter*, 511 U.S. 462 (1994), the Supreme Court rejected an APA claim challenging the Secretary of Defense's selection of military base closure criteria and recommendations on specific military bases to close under the Defense Base Closure and Realignment Act of 1990, as well as the resulting recommendations on base closures made by an independent commission following public hearings. *Id.* at 469–70. The commission recommended base closures in a report to the President, who by statute could either approve or disapprove of the findings and was then required to submit a certification of his decision to Congress. *Id.* at 465. The Court ruled that the base closing decision was made when the President either approved or disapproved of the commission's recommendations, and that the President's

statutorily required certification to Congress was the final action that effected the base closures. *Id.* at 469. The Court emphasized that the actions of the Secretary of Defense and the commission could not themselves close the bases and that the statute did not limit the President in his discretion to approve or disapprove of the commission's recommendation. *Id.* at 470. Together, these cases establish that prior agency action that forms the basis of a presidential decision is not reviewable under the APA where the final agency action is one taken by the President, not the agency.

Here, the agency actions in designing and conducting the "worldwide review," identifying countries that failed to meet the baseline criteria, and producing the DHS report recommending which countries to include in the travel ban and what specific restrictions to impose, were all only recommendations to the President, and, at most, the "ruling of a subordinate official" not subject to APA review. *See Franklin*, 505 U.S. at 797. By statute, only the President can "by proclamation, and for such periods as he shall deem necessary, suspend the entry of all aliens or a class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). Thus, like the commission's recommendation in *Dalton*, which slated no bases for closure until approved by the President, the agencies' pre-Proclamation actions are not final agency actions subject to APA review. *See Dalton*, 511 U.S. at 470.

### 2. Post-Proclamation Agency Action

In their APA Claims, the IRAP and Zakzok Plaintiffs generally challenge post-Proclamation actions taken by the agencies. Specifically, the IRAP Plaintiffs claim that the "actions of Defendants that are required or permitted by" the Proclamation were contrary to the APA. IRAP 2d Am. Compl. ¶¶ 414–416. Similarly, the Zakzok Plaintiffs' APA claim challenges the agencies' "issuing and implementing the Proclamation." Zakzok Am. Compl. ¶¶ 105, 112.

Plaintiffs do not provide any more specific description of what particular post-Proclamation agency actions they assert to be arbitrary and capricious or adopted without adherence to required procedures.

As discussed above, agency actions implementing a presidential action may be reviewed under the APA, even when the agency action accomplishes a presidential directive. *See supra* part III.A. However, to obtain review under 5 U.S.C. § 704, plaintiffs must identify the challenged "agency action," defined as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). A "failure to act" refers to the failure to take a defined "agency action." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–63 (2004). The Supreme Court has interpreted this definition to necessarily require a "discrete" action. *Id.* Accordingly, courts that have conducted APA review of agency actions implementing a presidential directive are typically presented with a discrete agency rule or decision to review. *See, e.g.*, *East Bay Sanctuary Covenant*, 909 F.3d at 1236–37 (interim final rule); *Sherley*, 689 F.3d at 784–85 (agency guidelines); *City of Carmel-by-the-Sea*, 123 F.3d at 1166 (agency findings of compliance with Executive Orders); *Zhang*, 55 F.3d at 743–45, 748–49 (interim and final rules); *Stone v. Trump*, 280 F. Supp. 3d 747, 757, 771 (D. Md. 2017) (interim guidance).

By contrast, in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), the Supreme Court concluded that an APA challenge to a Bureau of Land Management ("BLM") "land withdrawal review program" did not seek review of a "final agency action" within the meaning of § 704, because it did not challenge a particular BLM order or regulation, or even a specific individual classification termination made by the BLM. *Id.* at 890. "Under the terms of the APA, [a plaintiff] must direct its attack against some particular 'agency action' that causes it harm." *Id.*

at 891. In *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C Cir. 1996), for example, the court held that the plaintiffs "could not possibly have relied on the APA for a cause of action prior to the Secretary's issuance of regulations implementing the Executive Order." *Id.* at 1326.

Plaintiffs have not identified any cases in which courts have conducted APA review for compliance with substantive and procedural requirements without a defined final agency action. Rather, they focus on the prior determinations by this Court and higher courts that the Proclamation could be reviewed for whether it violates the Constitution or the INA, and precedent permitting the review of presidential action for compliance with the Constitution or federal statutes.

Such reliance is misplaced. At the preliminary injunction phase, the Court's review of Plaintiffs' statutory claims was limited to the argument that the Proclamation violated certain provisions of the INA. *IRAP I*, 265 F. Supp. 3d. at 605. Because Plaintiffs had framed their statutory claims with reference to the APA as the vehicle for asserting their claims, the Court referred to the APA in ruling that it could review the Proclamation for compliance with the INA. *See id.* at 603–04; *see also* 5 U.S.C. § 706(2)(B)–(C) (permitting review of agency actions for compliance with the Constitution and statutes). In so ruling, however, the Court relied on precedent allowing for review of presidential action outside of the APA context to determine whether it violated a substantive federal statute. *See IRAP I*, 265 F. Supp. 3d. at 603–04. Specifically, the Court relied on *Reich*, in which the court held that, outside the context of the APA, judicial review of an Executive Order for compliance with federal statutes was available through a suit against the agency implementing that order, in that case the Department of Labor. *Reich*, 74 F.3d at 1328. Specifically, the *Reich* court held that it could review a claim that President Clinton's Executive Order barring agencies from contracting with employers that

permanently replaced lawful strikers on high-value contracts violated the National Labor Relations Act. *Id.* at 1324, 1328–29. The court reasoned that it was "untenable to conclude that there are no judicially enforceable limitations on presidential actions" that would "bypass scores of statutory limitations on governmental authority." *Id.* at 1332. Under *Reich*, Plaintiffs' claim that the President's Proclamation exceeded his delegated authority under the INA, which has since been dismissed, was properly subject to judicial review. *See id.*; *IRAP I*, 265 F. Supp. 3d. at 603–04.

In *Hawaii I*, the Ninth Circuit, in concluding that it could review the Proclamation for compliance with the INA, similarly referenced the APA, but saw fit to separately conclude that even in the absence of any "final agency action," based on *Reich* and other precedent, courts can review presidential action that exceeds statutory authority, separate and apart from the APA. *Hawaii I*, 878 F.3d at 680–83; *see also IRAP II*, 883 F.3d at 287–88 (Gregory, C.J., concurring) (finding both APA final agency action and inherent judicial authority to review "executive action alleged to exceed statutory grants of authority"). In *Hawaii II*, the Supreme Court assumed without deciding that the plaintiffs' statutory claims were reviewable, but noted that in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), it had considered the merits of a claim that an Executive Order violated the INA. *Hawaii II*, 138 S. Ct. at 2407.

Beyond *Reich* and *Sale*, other courts have considered suits challenging a presidential action as contrary to statutory authority without reference to the APA. *See Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 555–56 (1976) (reviewing, through a suit against the Federal Energy Administration, a challenge to a Presidential Proclamation modifying the Mandatory Oil Import Program as beyond the President's statutory authority); *see also Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 797–98 (D.C. Cir. 1987) (considering, through a lawsuit

24

against the United States Coast Guard and the Immigration and Naturalization Service, claims that an Executive Order directing agencies to prevent illegal migration by sea violated the Refugee Act, the INA, the Constitution, and an extradition treaty and statute, finding that plaintiffs lacked standing to pursue the claims, but noting that if plaintiffs had standing, they might have been able to "challenge the interdiction program as *ultra vires* the President's statutory and constitutional authority").

Thus, although it is firmly established that a court may review presidential action to determine whether it conflicts with, or exceeds the authority granted by, a federal statute, courts so ruling have generally relied on authority outside the APA. It does not follow from this precedent that presidential action such as the Proclamation can be deemed "final agency action" for purposes of a claim that it violates the substantive and procedural requirements of the APA such as the arbitrary-and-capricious standard and the notice-and-comment rulemaking requirement.

Where the Proclamation cannot constitute the "final agency action," Plaintiffs have not identified any discrete, post-Proclamation action taken by an agency that can be characterized as a final agency action, in the form of a legislative rule, an interim final rule, a policy statement, an interpretive rule, or an order. At the hearing on the Motion, the Court inquired whether Plaintiffs were challenging certain referenced documents or materials, such as portions of the State Department website relating to the Proclamation or internal State Department or DHS guidance regarding how to implement the Proclamation, but Plaintiffs failed to define the "final agency action" they challenge. Plaintiffs similarly have not presented a claim that the agencies have failed to take an action required by the Proclamation or by law. *See* 5 U.S.C. § 551(13) (defining "agency action" to include an agency's "failure to act"); *S. Utah Wilderness All.*, 542 U.S. at 64

(holding that an agency's failure to act must be "discrete" and an action the agency "is required to take" to be reviewable under the APA (emphasis omitted)).

The Court recognizes that identifying a final agency action is no easy task, given that the State Department and DHS appear not to have complied with the Proclamation, which requires them to take certain actions such as adopting guidance regarding the waiver process and submitting reports to the President, Procl. §§ 3(c), 4(a), 5(a), or have hidden this compliance from public scrutiny. Although Plaintiffs have noted in their Opposition to the Motion that the Proclamation mandates the issuance of guidance relating to the Proclamation's waiver provisions, they do so in the context of arguing the merits of the Motion, not in identifying a final agency action. They do not specify, and make no claim in the Complaints, that the failure to issue any rule or guidance to implement the waiver provisions of the Proclamation, or to comply with any other legal requirements triggered by implementation of the Proclamation, is itself a "final agency action." *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) ("[The plaintiff] is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint."), *aff'd*, 141 F.3d 1162 (4th Cir. 1998). The Court is left genuinely uncertain as to what theory, if any, Plaintiffs pursue that would constitute a challenge to a final agency action. Because Plaintiffs have not identified an articulable final agency action underlying their APA Claims, the Court will dismiss the APA Claims without prejudice. Nevertheless, where Plaintiffs persuasively allege in their Complaints that they continue to be harmed by the Proclamation because it subjects them to prolonged and indefinite separation from their family members, Plaintiffs will be granted leave to amend their complaints to address this deficiency. *See* Fed. R. Civ. P. 15(a)(2).

Because the Court finds Plaintiffs' Complaints deficient on this point, it does not address the Government's remaining arguments, that the action is not reviewable because it is committed to agency discretion, that Plaintiffs' claims fail arbitrary-and-capricious review, and that any rules promulgated by the agencies are not subject to the requirements of 5 U.S.C. § 553 because they fall under the foreign affairs exception.

## IV.     Constitutional Claims

The Government argues that Plaintiffs' Constitutional Claims "are foreclosed" because the Supreme Court held that the plaintiffs were unlikely to succeed on the merits of their Establishment Clause claim in *Hawaii II*. Mot. Dismiss 21, ECF No. 265-1. Specifically, the Government argues that because the Court found that the Proclamation set forth "a sufficient national security justification to survive rational basis review," *Hawaii II*, 138 S. Ct. at 2423, the Constitutional Claims cannot succeed. The Government also argues that Plaintiffs have failed to allege personal injury sufficient to prevail on their due process, Establishment Clause, and equal protection claims.

### A.     *Hawaii v. Trump*

#### 1.     The Supreme Court Opinion

In *Hawaii II*, the Supreme Court vacated a preliminary injunction on the Proclamation in part on the grounds that the plaintiffs had not "demonstrated a likelihood of success on the merits of their constitutional claim." *Hawaii II*, 138 S. Ct. at 2423. In reaching this conclusion, the Court applied the legal standard set forth in *Kleindienst v. Mandel*, 408 U.S. 753 (1972), which held that pursuant to Congress's plenary power over immigration, courts review a claim that a consular officer denied a visa in contravention of constitutional rights to determine only whether there was a "facially legitimate and bona fide reason" for the denial, and that courts will not "look

27

behind the exercise of that discretion." *Id.* at 770 (rejecting a claim that the denial of a visa to Mandel, a Marxist, violated the First Amendment rights of professors who invited him to speak because the Government offered the facially legitimate reason that on a prior visit, Mandel had engaged in activities outside the scope of his visa); *Hawaii II*, 138 S. Ct. at 2419. Although *Mandel* involved the denial of an individual visa, the Supreme Court stated that the narrow *Mandel* standard applies to "different contexts and constitutional claims," including visa denials and "broad congressional" policies, and "has particular force" in cases "that overlap with the area of national security." *Hawaii II*, 138 S. Ct. at 2419 (citing *Fiallo v. Bell*, 430 U.S. 787, 795 (1977), and *Kerry v. Din*, 135 S. Ct. 2128, 2141 (2015) (Kennedy, J., concurring)).

In applying the *Mandel* standard to the Proclamation, the Supreme Court found that the Proclamation was facially neutral as to religion and provided a national security justification for its issuance and thus was "facially legitimate." *See id.* at 2420; *see also Kerry v. Din*, 135 S. Ct. 2128, 2140–41 (2015) (Kennedy, J. concurring) (stating that a decision denying admission to the United States is "facially legitimate" if the Government provides a statutory basis for the denial); *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (citation omitted)). As for the "bona fide" prong, the Fourth Circuit and this Court, relying on *Din*, had previously equated that requirement to a lack of any "affirmative showing of bad faith" by the decisionmaker and concluded that, if there is a particularized showing of bad faith, a court should then "look behind" the action to evaluate its justification. *Din*, 135 S. Ct. at 2041 (Kennedy, J. concurring); *see IRAP II*, 883 F.3d at 264; *IRAP I*, 265 F. Supp. 3d at 617.

However, the Supreme Court, while declining to "define the precise contours" of a *Mandel* inquiry in the context of the present case, concluded that it should "look behind the face of the Proclamation to the extent of applying rational basis review." *Hawaii II*, 138 S. Ct. at 2420. The Court defined rational basis review as an assessment, including consideration of "extrinsic evidence," under which the Court would "uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Id.*

Applying this standard, the Supreme Court held that on the record before it, "the Government has set forth a sufficient national security justification to survive rational basis review" and that the plaintiffs therefore had "not demonstrated a likelihood of success on the merits of their constitutional claim." *Id.* at 2423. The Supreme Court also concluded that the proffered purposes of "preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices" were legitimate. *Id.* at 2421. It chose not to infer "religious hostility" from the fact that five of the Designated Countries have Muslim-majority populations, because those countries had been "previously designated by Congress or prior administrations as posing national security risks." *Id.* It credited the thoroughness of the pre-Proclamation worldwide review and rejected the plaintiffs' efforts to undermine the Proclamation on the basis that it deviates in part from the results of the baseline criteria evaluation. *Id.* Highlighting the national security context and deferring to "the Executive's predictive judgments on such matters," the Supreme Court dismissed assertions of the Proclamation's supposed overbreadth or failure to serve national security interests. *Id.* at 2421–22. To further support its finding of an independent, constitutional justification for the Proclamation, the Supreme Court noted that three Muslim-majority countries have been removed from the travel ban since its inception with EO-1, that the entry restrictions are "conditional" on the Designated

Countries' failure to share information adequately, and that the agencies are required to conduct "ongoing" efforts to reevaluate the ban. *Id.* at 2422. It also stressed that the Proclamation does not impose a complete ban on nationals from the Designated Countries, but instead contains exceptions for lawful permanent residents and certain categories of nonimmigrant visas. *Id.* Finally, the Supreme Court emphasized that the Proclamation created a waiver process, to be set forth in guidance to be issued by the State Department and DHS, to allow the case-by-case admission of foreign nationals who do not pose a threat to public safety, whose denial of entry would impose undue hardship, and whose entry would be in the interests of the United States. *Id.* at 2422–23.

### 2. Rational Basis

As a threshold matter, where the Supreme Court has deemed the *Mandel* standard to be applicable to the Establishment Clause claim, it necessarily applies to Plaintiffs' other constitutional claims alleging that the Proclamation violates the equal protection and procedural due process components of the Fifth Amendment, the right to freedom of speech under the First Amendment, and the right to freedom of association under the First Amendment. Generally, the *Mandel* standard has been applied to claims that an immigration policy or statute infringes a U.S. citizen's rights under the Constitution, without regard to which constitutional right is alleged to have been infringed. Specifically, courts have applied the *Mandel* standard to cases claiming violations of each of the constitutional rights at issue in Plaintiffs' claims. *See id.* at 2419 (Establishment Clause); *Din*, 135 S. Ct. at 2139 (Kennedy, J., concurring) (procedural due process); *Fiallo v. Bell*, 430 U.S. 787, 791 (1977) (First Amendment freedom of association and Fifth Amendment equal protection and due process); *Mandel*, 408 U.S. at 760 (First Amendment freedom of speech); *see also Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008) (Fifth

Amendment equal protection). The analysis does not differ depending on the right that is alleged to have been impinged. For example, in *Fiallo*, the Supreme Court applied the same analysis to the plaintiffs' multiple constitutional claims when reviewing the challenged statute under the *Mandel* standard. *See Fiallo*, 430 U.S. at 798–99. The Court's application of the *Mandel* standard and rational basis review to the Proclamation therefore applies equally to all of Plaintiffs' Constitutional Claims.

The rational basis standard is most typically applied to a government classification in "areas of social and economic policy" that "neither proceeds along suspect lines nor infringes fundamental constitutional rights." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Under rational basis review, such a classification is to be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* Courts are not "to judge the wisdom, fairness, or logic" of the classification. *Id.* In *Hawaii II*, the Supreme Court summarized the test as requiring a classification to be upheld "so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii II*, 138 S. Ct. at 2420.

Because "the challenged classification need only be rationally related to a legitimate state interest," *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th. Cir. 2008), it is not necessary that the reason for the policy offered by the government "actually motivated the" decisionmaker, *Beach Commc'ns*, 508 U.S. at 315. Rather, if the purpose "is legitimate and nonillusory, its lack of primacy is not disqualifying." *McGinnis v. Royster*, 410 U.S. 263, 276 (1973). It does not matter if the law "seems to be unwise or works to the disadvantage of a particular group" or is premised on a "tenuous" rationale. *Romer v. Evans*, 517 U.S. 620, 632 (1996).

Although rational basis is a highly deferential standard, it does not always require rejection of a challenge to a statute or other governmental classification. The Supreme Court has, on occasion, invalidated governmental classifications for failing to meet this standard. In *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985), the Court held that a zoning requirement that a group home for the mentally disabled obtain a special use permit, when other multi-occupancy homes need not do so, failed rational basis review. *Id.* at 448–49. In so ruling, the Court considered all of the proffered reasons for the classification, including that students from a nearby school might harass the occupants, that the home would be located on a flood plain, concerns about legal responsibility for the residents' actions, and the size of the residence and number of occupants. *Id.* at 449. The Court found that the evidence refuted all of the stated justifications and was left with the conclusion that the classification rested on "an irrational prejudice against the mentally retarded." *Id.* at 449–50.

In another case, the Supreme Court invalidated on rational basis review a restriction on providing food stamps to households of unrelated individuals where members of Congress had stated that the measure was aimed at preventing "hippie communes" from receiving food stamps *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). The Court determined that the proffered reason for the measure, to combat fraud in the food stamp program based on the unsubstantiated view that households with unrelated individuals were more likely to abuse the program and include individuals voluntarily remaining poor, did not rationally support a ban on food assistance to all unrelated households. *Id.* at 535–36.

Likewise, in *Romer v. Evans*, 517 U.S. 620 (1996), the Supreme Court, under rational basis review, invalidated a state constitutional amendment barring governmental action to provide legal protections to gays and lesbians based on the finding that it was "inexplicable by anything

but animus toward the class it affects." *Id.* at 632. The Court rejected the proffered purposes of conserving resources to fight discrimination against other groups and respecting other citizens' freedom of association and personal or religious objections, found no "factual context from which we could discern a relationship to a legitimate state interest," and thus concluded that it was enacted for the impermissible purpose of making homosexuals "unequal to everyone else." *Id.* at 635.

Under *Cleburne*, *Moreno*, and *Romer*, the Proclamation would fail rational basis review if the evidence revealed that for each of its stated purposes, either that purpose was not a legitimate state interest or, if legitimate, there was no rational relationship between the Proclamation and that purpose, such that the only identifiable purpose was unconstitutional animus toward Muslims. In effect, Plaintiffs will need to provide evidence to squarely refute the assertion that the Proclamation is rationally related to the national security goals of preventing entry of inadequately vetted individuals and inducing other nations to improve information sharing. *See Hawaii II*, 138 S. Ct. at 2421.

### 3. Motion to Dismiss

Relying on *Giarratano*, the Government argues that Plaintiffs fail to state a claim on the Constitutional Claims because their Complaints fail to meet "the burden to negate every conceivable basis which might support" the Proclamation. *Giarratano*, 521 F.3d at 303 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1974)). *Giarratano*, however, clarified that while a plaintiff must meet this bar to prevail on the merits, it need not do so at the motion to dismiss stage:

> The rational basis standard requires the government to win if any set of facts reasonably may be conceived to justify its classification; the Rule 12(b)(6) standard requires the plaintiff to prevail if "relief could be granted under any set of facts that could be proved consistent with the allegations." The rational basis

standard, of course, cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard. The latter standard is procedural and simply allows the plaintiff to progress beyond the pleadings and obtain discovery, while the rational basis standard is the substantive burden that the plaintiff will ultimately have to meet to prevail.

*Id.* at 303 (citations omitted) (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 459–60 (7th Cir. 1992)). Thus, to prevail on a motion to dismiss for failure to state a claim, "a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Id.* at 304 (quoting *Wroblewski*, 965 F.2d at 460). A set of "conclusory" assertions and claims do not "overcome the presumption of rationality." *Id.*

Unlike in *Giarratano*, where the complaint contained only conclusory allegations that a policy of not permitting prisoners to make requests for public records under the state Freedom of Information Act was not "rationally related to any legitimate government interest," *id.*, Plaintiffs have provided detailed allegations for why the Proclamation is not rationally related to its stated national security interests and is instead grounded in the illegitimate and unconstitutional purpose of disadvantaging Muslims.

First, the Complaints provide detailed allegations of statements by the President exhibiting religious animus toward Muslims and articulating a desire to ban Muslims from entering the United States, including his statement as a presidential candidate that he planned to institute "a total and complete shutdown of Muslims entering the United States" and numerous later statements reaffirming this position. IRAP 2d Am. Compl. ¶ 55; IAAB 2d Am. Compl. ¶ 28 Zakzok Am. Compl. ¶ 20. The Complaints further describe statements during the campaign in which President Trump clarified that he would accomplish this Muslim ban by barring entry from certain "territories" because "people don't want me to say Muslim." IRAP 2d Am. Compl. ¶ 74; IAAB 2d Am. Compl. ¶¶ 34-35; Zakzok Am. Compl. ¶ 27. On the day that President Trump

34

signed EO-1, Rudolph Giuliani, an advisor to President Trump, stated that it was the product of an effort directed by President Trump to put the "Muslim ban" into effect "legally" by using territory as a proxy for religion. IRAP 2d Am. Compl. ¶ 65; IAAB 2d Am. Compl. ¶ 39; Zakzok Am. Compl. ¶ 27. Even after EO-1 and EO-2 were withdrawn or enjoined by courts, President Trump made a statement reflecting his intent to issue a third travel ban for the same purpose by stating on Twitter that the Justice Department "should have stayed with the original Travel Ban, not the watered down, politically correct version" and that there should be a "much tougher version." IRAP 2d Am. Compl. ¶ 190.

Contrary to the Government's claim during the hearing on the Motion, *Hawaii II* does not instruct courts to disregard these statements or any public pronouncements of a President, nor does it hold that the subjective intent of the President and his advisors in formulating and issuing the Proclamation is irrelevant. Rather, the Supreme Court specifically stated that this evidence "may be considered," so long as the "authority of the Presidency itself" is given its due. *Hawaii II*, 138 S. Ct. at 2418, 2420. This Court is equally aware that ignoring "relevant information," like the President's statements here, "undermines judicial legitimacy by making the public believe judicial decisions rest on a false or inaccurate characterization of the governing facts." *IRAP II*, 884 F.3d at 345 (Wynn, J., concurring). Viewing these facts in the light most favorable to Plaintiffs, these allegations support a conclusion that the Proclamation was issued for the illegitimate purpose of advancing fear and hatred toward Muslims and to impose a particular legal disadvantage on them. *See Moreno*, 413 U.S. at 534 (invalidating on rational basis review a restriction on providing food stamps to households of unrelated individuals based in part on the finding that statements of legislators revealed that the measure was intended to keep "hippies" and "hippie communes" from benefiting from the food stamp program). Such hostility "cannot

35

constitute a *legitimate* government purpose." *Id.*; *Cleburne*, 473 U.S. at 448 (noting that even on rational basis review, the "law, directly or indirectly, cannot give" private biases effect).

Second, although the presence of an impermissible purpose is not sufficient to invalidate a classification on rational basis review, the Complaints also provide specific allegations aimed at refuting "the presumption of rationality" that applies to the Proclamation's stated national security purposes. *Giarratano*, 521 F.3d at 304 (quoting *Wroblewski*, 965 F.2d at 460). For example, Plaintiffs assert that while the baseline criteria were established to identify nations that lacked sufficient vetting or information sharing, the Proclamation deviates from those standards: Somalia, a majority-Muslim nation that was not deemed "inadequate" under the baseline criteria, was included in the travel ban. One of the seven nations deemed to be "inadequate," Venezuela, is not majority-Muslim and received much less severe travel restrictions, limited only to government officials responsible for the inadequacies. The Proclamation also acknowledges that a total of 16 countries were identified as "inadequate" but provides no explanation for the failure to include them other than that they generally had "improve[d] their performance" following engagement with their governments, without stating whether such improvements resulted in full compliance with the baseline criteria. Procl. § 1(e), (f); IRAP 2d Am. Compl. ¶ 215. When viewed in the light most favorable to Plaintiffs, these allegations of uneven application of purportedly neutral criteria undermine the national security rationale for the Proclamation's travel ban against majority-Muslim nations. *See Cleburne*, 473 U.S. at 448–50 (finding no rational basis for the denial of a permit to a group home for the mentally challenged in part because stated factors for the decision such as location on a flood plain, doubts regarding legal responsibility, traffic congestion, the size of the building, and the number of occupants applied equally to other types of group homes not subject to the same requirement).

Third, Plaintiffs have specifically alleged that the waiver process has not been applied in a manner consistent with the stated national security purposes of the Proclamation. Although the Supreme Court found that the Proclamation's waiver process was persuasive evidence of its national security purpose, *Hawaii II*, 138 S. Ct. at 2422–23, Plaintiffs have asserted that the waiver process is a "pretext for excluding Muslims from the United States" and is not "tailored to address national security risks." Zakzok Am. Compl. ¶ 52. Although the "Proclamation directed the State Department and DHS to issue guidance on implementing the waiver process," the agencies "have largely failed to do so," such that "in practice there is no procedure to apply for these waivers." IAAB 2d Am. Compl. ¶¶ 82–83. Plaintiffs further assert that waivers have been granted at a rate of only approximately two percent, that "thousands" of "individuals who clearly meet the Proclamation's criteria have repeatedly been denied a waiver," and that individuals, such as the mother-in-law of one of the IAAB Plaintiffs, have been denied waivers before they even applied. *Id.* ¶¶ 16, 84–85. They also allege, based on statements by former consular officials, that the waiver process is a "fraud," that consular officials were directed "to determine at all possible cost" that an applicant "was not eligible to even apply for the waiver," and that "even if an applicant satisfies the criteria for a waiver, consular officials are not allowed to . . . grant a waiver." *Id.* ¶¶ 84–85. The allegations of a systematic refusal to grant waivers to individuals who meet stated criteria, including that they do "not pose a threat to the national security or public safety of the United States," Proc.§ 3(c), further support the inference that the Proclamation is not rationally related to the stated national security interests, but is instead a pretext for discrimination.

Among Plaintiffs' other relevant allegations are that because DHS previously determined that a person's country of citizenship is unlikely to be a reliable indicator of potential terrorist

activity, the Proclamation's nationality-based suspensions do not further the national security purpose. Moreover, Plaintiffs allege that the travel ban does not rationally advance national security because there already exists legal authority to exclude any potential national security threat, including that individual applicants are required to submit a detailed application and undergo an in-person interview as part of the visa process. 8 U.S.C. §§ 1182(a)(2)–(3), 1202; *cf. Moreno*, 413 U.S. at 536 (finding no rational basis for a restriction on the provision of food stamps to households with unrelated members in part because the Food Stamp Act already had provisions to address food stamp fraud, the stated justification for the policy).

Taking the allegations in the Complaints in the light most favorable to Plaintiffs, as the Court must at the motion to dismiss stage, the Court concludes that Plaintiffs have put forward factual allegations sufficient to show that the Proclamation is not rationally related to the legitimate national security and information-sharing justifications identified in the Proclamation and therefore that it was motivated only by an illegitimate hostility to Muslims. *See Moreno*, 413 U.S. at 534–38 (rejecting the Government's argument that the provision helped the Government fight fraud).

The Government argues that the Supreme Court's finding in *Hawaii II*, on a similar record to the one before this Court, that the Proclamation satisfies rational basis scrutiny forecloses the Constitutional Claims. The fact that the Supreme Court reached this conclusion after consideration of many of the same facts asserted in the Complaints, however, is not dispositive. On a motion for a preliminary injunction, a court reviews the facts available in the limited record before it and makes an assessment on the merits of a claim. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.");

*see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (holding that on a motion for a preliminary injunction, the court considers the "likelihood of success on the merits"). Such a merits assessment under rational basis review "requires the government to win if any set of facts reasonably may be conceived to justify its classification." *Giarratano*, 521 F.3d at 303. Because the rational basis standard "cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard," on a motion to dismiss the court must view the facts in the light most favorable to the plaintiff and find for the plaintiff "if relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* The court must do so because the motion does not test the merits of the case, but only whether the plaintiff is allowed "to progress beyond the pleadings and obtain discovery." *Id.* Thus, the Supreme Court's assessment on the merits of the particular facts before it, applying the "substantive burden that the plaintiff will ultimately have to meet to prevail," does not answer whether under the highly deferential Rule 12(b)(6) standard, Plaintiffs have stated a plausible claim for relief so as to proceed further. *Id.* (citations omitted) (quoting *Wroblewski*, 965 F.2d at 459–60).

Moreover, as the Supreme Court acknowledged, rational basis review is conducted not simply on the face of the Proclamation or other policy at issue but contemplates that the court will "look behind" the face of the Proclamation and will include consideration of the "extrinsic evidence" in the record. *Hawaii II*, 138 S. Ct. at 2420. At the preliminary injunction stage, however, the Supreme Court's analysis focused largely on a review of the statements in the Proclamation itself and the limited extrinsic record consisting primarily of the documented statements of the President regarding Muslims. *See id.* at 2420–23. Notably, the Supreme Court's ultimate determination that the classification in *Cleburne* failed rational basis scrutiny was based

on consideration of a record including district court findings of fact. *Cleburne*, 473 U.S. at 449–50.

Here, the pending Complaints already assert additional facts not available at the time of the Supreme Court's ruling. For example, the Supreme Court found that the facts before it relating to the deficiencies in the waiver process "did not affect" its analysis, largely because the information was incomplete or taken from inappropriate sources. *Hawaii II*, 138 S. Ct. at 2423 n.7. Since that time, no formal waiver guidance has been issued, and no application process or other procedure has been established for individuals to seek a waiver. The lack of such guidance extended for four months after the Supreme Court's ruling until the filing of the Amended Complaints in October 2018 and apparently has now extended another six months during this Court's consideration of the pending Motion. As asserted by the IAAB Plaintiffs, applicants and their attorneys have been informed that there is no role for legal services to facilitate the waiver process. Even after discussion at the hearing on the Motion, it is unclear whether, as required by the Proclamation, DHS and other departments and agencies have devised a process to assess whether the Proclamation's restrictions should continue or be terminated, and whether the required periodic reports on this issue have, in fact, been produced. *See* Procl. § 4. Thus, the Supreme Court's merits analysis of the Proclamation under rational basis review was based on a preliminary record representing a snapshot in time and does not necessarily preclude a different determination at a later stage of the case on a more fulsome record.

Notably, at no point in *Hawaii II* did the Supreme Court state that its conclusion that the Proclamation would satisfy rational basis review, based on the record before it and in the context of a motion for a preliminary injunction, required dismissal of the Establishment Clause claim in either that case or the present case. Indeed, two Justices, including one in the majority, identified

the possibility that constitutional claims would proceed. Justice Kennedy stated that "[w]hether judicial proceedings may properly continue in this case in light of the substantial deference that is and must be accorded to the Executive in the conduct of foreign affairs, and in light of today's decision, is a matter to be addressed in the first instance on remand." *Hawaii II*, 138 S. Ct. at 2424 (Kennedy, J., concurring). After discussing the lack of clarity on whether exemptions and waivers are being granted appropriately, Justice Breyer noted that "the Court's decision today leaves the District Court free to explore these issues on remand." *Id.* at 2433 (Breyer, J., dissenting).

Thus, at the Rule 12(b)(6) stage, where all reasonable inferences are to be drawn in favor of Plaintiffs, *Albright*, 510 U.S. at 268, Plaintiffs have alleged sufficient facts to overcome the presumption of rationality and thus may "progress beyond the pleadings." *Giarratano*, 298 F.3d at 303. The Court emphasizes that in denying the motion to dismiss as to the Constitutional Claims, it makes no determination of what discovery Plaintiffs are entitled to receive. It also notes that under rational basis review, Plaintiffs face the tall order of ultimately presenting evidence that not only undermines, but specifically refutes, the Government's contention that the Proclamation is rationally related to the stated legitimate national security purposes. *See Cleburne*, 473 U.S. at 450 (refuting all proffered legitimate purposes for the classification before invalidating it under rational basis review as resting solely on "irrational prejudice"); *Giarratano*, 521 F.3d at 303 (requiring the plaintiff to "negate every conceivable basis which might support" the classification to invalidate it under rational basis review).

## B. Due Process

The Government also argues that Plaintiffs' due process claims must be dismissed because Plaintiffs have no cognizable liberty or property interest that could be burdened by the

Proclamation. When a plaintiff makes a claim under the Due Process Clause, the court evaluates whether the plaintiff has been deprived of a liberty or property interest, and if so, whether the government's procedures were "constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam). A liberty interest may arise from the Constitution or "an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Plaintiffs assert that they have alleged a liberty interest in family relationships and family unity, or in the expectations created by the immigration laws and regulations that allow them to petition for visas for their relatives.

In *Din*, the Supreme Court left open the question whether an interest in family relationships and unity rises to a protected liberty interest in the context of a due process claim. While the three-Justice plurality rejected the existence of such an interest, *Din*, 135 S. Ct. at 2138 (plurality opinion), Justice Kennedy and Justice Alito assumed without deciding that the plaintiff had a protected liberty interest in the denial of her husband's visa before concluding that her procedural due process rights had not been violated, *id.* at 2140–41 (Kennedy, J. concurring); *see Marks*, 430 U.S. at 193. Four dissenting Justices concluded that such a liberty interest is cognizable. *Din,* 135 S. Ct. at 2142–43 (Breyer, J., dissenting). With *Din* failing to resolve the issue, some courts of appeals have assumed without deciding that individuals have a due process right relating to visa denials of family members. *See, e.g.*, *Yafai v. Pompeo*, 912 F.3d 1018, 1021 (7th Cir. 2019); *Ali v. United States*, 849 F.3d 510, 515 & n.3 (1st Cir. 2017). The Ninth Circuit has specifically endorsed the existence of such a liberty interest in the context of a U.S. citizen's challenge to the denial of her husband's visa application. *Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008) ("Freedom of personal choice in matters of marriage and family life is, of course, one of the liberties protected by the Due Process Clause."); *see also IRAP II*, 883 F.3d at

42

332 (Wynn, J., concurring) ("[D]enying entry to classes of aliens based on invidious discrimination has the potential to burden the fundamental right of *residents* to marry the partner of their choice based on nothing more than the partner's race, sex, nationality, or religion."). Where Plaintiffs have offered a due process theory that has been considered but not foreclosed by the Supreme Court, and in fact is recognized by at least one United States Court of Appeals, this Court concludes that dismissal is not warranted. *See Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004) (*en banc*) (per curiam) (holding that dismissal was not warranted where plaintiffs were asserting a novel claim under Section 2 of the Voting Rights Act because "plaintiffs are entitled to an opportunity to develop evidence before the merits are resolved"); *Dart Drug Corp. v. Corning Glass Works*, 480 F. Supp. 1091, 1098 n.10 (D. Md. 1979) ("Novel legal claims are particularly inappropriate for dismissal if, as here, the Court can infer the existence of facts comprising all of the required elements. A proper test for such a claim is a motion for summary judgment after discovery sufficient to uncover relevant facts has been completed." (citation omitted)).

The Government also argues that even if Plaintiffs have a cognizable liberty interest in reunification with family members, due process was in fact provided in the case of Doe Plaintiff No. 6, one of the IAAB Plaintiffs, because his mother-in-law was informed that her visa was denied on the basis of the Proclamation. The Government relies on Justice Kennedy's statement in *Din* that due process relating to the denial of a family member's visa is satisfied when a notice was provided stating the "specific provision or provisions of law under which the alien is inadmissible." *Din*, 135 S. Ct. at 2141 (Kennedy, J. concurring) (quoting 8 U.S.C. § 1182(b)(1)). The IAAB Plaintiffs, however, have alleged that Doe Plaintiff No. 6's mother-in-law was denied a waiver before she could present information demonstrating that she was eligible for a waiver,

as contemplated by the Proclamation. The Proclamation requires that waivers be granted only where the "foreign national demonstrate[s] that waivers would be appropriate and consistent" with the Proclamation "to the consular officer's or CBP official's satisfaction." Procl. § 3(c). Where Plaintiffs have alleged a lack of due process arising from the failure to implement and follow waiver procedures contemplated by the Proclamation, a scenario not controlled by *Din*, the Court declines to find at the motion to dismiss stage that Doe Plaintiff No. 6 received due process as a matter of law. *See Metts*, 363 F.3d at 11; *Dart Drug Corp.*, 480 F. Supp. at 1098.

Having found the Government's proffered basis for dismissal of the procedural due process claims to be unpersuasive, the Court will deny the Motion as to those claims. Accordingly, and particularly where the Government did not challenge it in its Motion and addressed it only in its reply brief, the Court need not address whether Plaintiffs' alternative procedural due process theory, that they have a liberty interest in the statutory and regulatory provisions for filing petitions on behalf of family members, states a plausible claim for relief. *Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) ("[A]n issue first argued in a reply brief is not properly before a court of appeals."); *Chang-Williams v. Dep't of the Navy*, 766 F. Supp. 2d 604, 620 n.16 (D. Md. 2011) ("Typically, courts will not consider an argument raised for the first time in a reply brief.").

### C.    Establishment Clause and Equal Protection

The Government also contends that Plaintiffs' Establishment Clause and equal protection claims must fail because Plaintiffs have not alleged a violation of their own personal rights. Again, the Government raises an argument that it effectively made in opposing the Motion for a Preliminary Injunction and that this Court did not accept. *See IRAP I*, 265 F. Supp. 3d at 599–602. This Court previously rejected the argument, based on *Valley Forge Christian College v.*

*Americans United For Separation of Church & State, Inc.*, 454 U.S. 464, 485–86 (1982), that Plaintiffs lacked standing because they had no "personal injury" from the Proclamation and instead held, relying on *Suhre v. Haywood County*, 131 F.3d 1083, 1086 (4th Cir. 1997), that certain Plaintiffs had standing to assert an Establishment Clause claim where they had both "a personal contact with the alleged establishment of religion through the prolonged separation from their family members and a direct injury from the Proclamation through their feelings of marginalization and exclusion" derived from their perception of the Proclamation as hostile to their own Muslim faith. *IRAP I*, 265 F. Supp. 3d at 601. The Supreme Court, in *Hawaii II*, similarly found that certain Plaintiffs had standing to assert an Establishment Clause claim based on the "concrete injury" of separation from relatives who sought to enter the United States and their "interest in being united with [their] relatives." *Hawaii II*, 138 S. Ct. at 2416.

The Government now seeks to repackage its unsuccessful standing argument as a different argument, that Plaintiffs fail on the merits of their Establishment Clause and equal protection claims because their personal rights have not been violated. But the Government's analysis relies almost entirely on case law relating to standing and offers no argument other than that Plaintiffs have suffered no personal injury from the Proclamation. Unlike in *McGowan v. Maryland*, 366 U.S. 420 (1961), cited by the Government, where there was no evidence that the plaintiffs' religious beliefs were burdened by Sunday closing laws, *id.* at 429, here, the individual Plaintiffs are themselves Muslims whose own religion is allegedly targeted by the Proclamation. Where this Court has already concluded that the Proclamation could be found to have injured Plaintiffs whose family members were excluded from the United States because of the Proclamation's alleged targeting of Muslims, and the Supreme Court largely validated that conclusion, the Court finds that such Plaintiffs have stated a plausible claim that their constitutional rights under the

Establishment Clause and the equal protection component of the Due Process Clause were violated by the Proclamation. *See Hawaii II*, 138 S. Ct. at 2416; *IRAP I*, 265 F. Supp. 3d at 599–602; *see also IRAP II*, 883 F.3d at 258–60; *cf. Din*, 135 S. Ct. at 1240 (Kennedy, J., concurring) (assuming without deciding that a U.S. citizen has a due process interest in the denial of a visa to her spouse).

## CONCLUSION

For the foregoing reasons, the Government's Motion to Dismiss, ECF No. 265, is GRANTED IN PART and DENIED IN PART. The Motion is granted as to the APA Claims. Those claims are DISMISSED WITHOUT PREJUDICE, but Plaintiffs will have an opportunity to amend their Complaints. The Motion is DENIED as to the Constitutional Claims. A separate Order shall issue.

Date: May 2, 2019

THEODORE D. CHUANG
United States District Judge